# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| BMO HARRIS BANK N.A.<br>111 W. Monroe Street<br>Chicago, Illinois 60603,<br><br>    Plaintiff,<br>    v.<br><br>3FC INVESTMENTS, L.L.C.<br>621 S. Centennial<br>Webb City, MO 64870<br><br>BRANDON FREED<br>8429 Dylan Lane<br>Joplin, MO 64804,<br><br>RONALD FREED<br>5607 Douglas Fir Rd<br>Joplin, MO 64804,<br><br>SCOTT COOPER<br>PO Box 3751<br>Joplin, MO 64803,<br><br>TONY FORSON<br>2900 Ironton Lane<br>Joplin, MO 64804,<br><br>    Defendants. | Case No.<br><br>Civil Action<br><br><br><br>**COMPLAINT** |

Plaintiff, BMO Harris Bank N.A.by and through its undersigned counsel, hereby submits this Complaint against 3FC Investments, L.L.C., Brandon Freed, Ronald Freed, Scott Cooper and Tony Forson and in support thereof, avers as follows:

## PARTIES

1.    Plaintiff, BMO Harris Bank N.A. (hereinafter "BHB") is a national banking organization and has a principal place of business in Chicago with an office at 111 W. Monroe Street, Chicago, Illinois 60603.

2.       3FC Investments, L.L.C (hereinafter "3FC") is a limited liability company organized and existing pursuant to the rules and laws of the State of Missouri, with its principal place of business at 615 S. Elliot, Webb City, MO 64870. 3FC is jointly owned one hundred percent by Brandon Freed, Ronald Freed, Scott Cooper and Tony Forson. Its citizenship is that of Brandon Freed, Ronald Freed, Scott Cooper and Tony Forson, set forth below.

3.       Brandon Freed (hereinafter "Brandon") is an individual who resides at 8429 Dylan Lane, Joplin, MO 64804, and is domiciled, a resident, and a citizen of the Western District of Missouri.

4.       Ronald Freed (hereinafter "Ronald") is an individual who resides at 5607 Douglas Fir Rd., Joplin, MO 64804, and is domiciled, a resident, and a citizen of the Western District of Missouri.

5.       Scott Cooper (hereinafter "Scott") is an individual who resides at PO Box 3751, Joplin, MO 64803, and is domiciled, a resident, and a citizen of the Western District of Missouri.

6.       Tony Forson (hereinafter "Tony") is an individual who resides at 2900 Ironton Lane, Joplin, MO 64804, and is domiciled, a resident, and a citizen of the Western District of Missouri.

## STATEMENT OF FACTS

### *Loan and Security Agreement 1(0001)*

7.       On or about June 26, 2015, 3FC entered into a Loan & Security Agreement (hereinafter "Agreement 1") with BHB in the total amount of $691,070.16, attached hereto as **Exhibit A**, for the purchase of the following:

| Year | Manufacturer | Model | Description | Serial Number |
|------|--------------|-------|-------------|---------------|
| 2016 | PETERBILT | 579 | 579 | 1XPBDP9X1GD340295 |
| 2016 | PETERBILT | 579 | 579 | 1XPBDP9X6GD340292 |
| 2016 | PETERBILT | 579 | 579 | 1XPBDP9X8GD340293 |

2

| 2016 | PETERBILT | 579 | 579 | 1XPBDB9XXGD340294 |
|------|-----------|-----|-----|-------------------|

8.      Pursuant to Agreement 1, 3FC agreed to make monthly payments for the purchase of the above Equipment (hereinafter "Equipment 1") beginning on or about August 1, 2015 for a term of 66 months.

9.      Upon information and belief, 3FC used Equipment 1 at its address located at 621 S Centennial, Webb City, MO 64870.

10.     Pursuant to Agreement 1, 3FC was obligated to pay a minimum monthly payment of $10,470.76.

11.     Pursuant to Paragraph 5.1 of Agreement 1, entitled "Events of Default," 3FC will be in default under the loan if "Debtor fails to pay when due any amount owed by it to Lender or any Affiliate of Lender under this Agreement."

12.     Pursuant to Paragraph 5.2 of Agreement 1, entitled "Remedies," upon default of 3FC, BHB may "declare the indebtedness hereunder to be immediately due and payable."

13.     On or about October 11, 2016, entered into a Modification Agreement (hereinafter "Modification 1") for Agreement 1. A true and correct copy of Modification 1 is attached hereto as **Exhibit B**.

14.     Pursuant to Modification 1, 3FC agreed to pay the balance of Agreement 1 as follows:

| Payment Amount | No. of Payments | Payment Date |
|----------------|-----------------|--------------|
| $0.00 | 2 | 10/01/2016 |
| $10,579.28 | 52 | 12/01/2016 |

15.     On or about October 1, 2019, 3FC defaulted under the terms of Modification 1 by failing to make the minimum monthly payment.

3

## *Loan and Security Agreement 2(0002)*

16.    On or about June 30, 2015 3FC entered into another Loan & Security Agreement (hereinafter "Agreement 2") with BHB in the total amount of $345,294.18, attached hereto as **Exhibit C**, for the purchase of the following:

| Year | Manufacturer | Model | Description | Serial Number |
|------|-------------|-------|-------------|---------------|
| 2016 | PETERBILT | 579 | 579 | 1XPBDB9X3GD340296 |
| 2016 | PETERBILT | 579 | 579 | 1XPBDP9X5GD340297 |

17.    Pursuant to Agreement 2, 3FC agreed to make monthly payments for the purchase of the above Equipment (hereinafter "Equipment 2") beginning on or about August 1, 2015 for a term of 66 months.

18.    Upon information and belief, 3FC used Equipment 2 at its address located at 621 S Centennial, Webb City, MO 64870.

19.    Pursuant to Agreement 2, 3FC was obligated to pay a minimum monthly payment of $5,231.73.

20.    Pursuant to Paragraph 5.1 of Agreement 2, entitled "Events of Default," 3FC will be in default under the loan if "Debtor fails to pay when due any amount owed by it to Lender or any Affiliate of Lender under this Agreement."

21.    Pursuant to Paragraph 5.2 of Agreement 2, entitled "Remedies," upon default of 3FC, BHB may "declare the indebtedness hereunder to be immediately due and payable."

22.    On or about October 11, 2016, entered into a Modification Agreement (hereinafter "Modification 2") for Agreement 2. A true and correct copy of Modification 2 is attached hereto as **Exhibit D**.

23.    Pursuant to Modification 2, 3FC agreed to pay the balance of Agreement 2 as follows:

4

| Payment Amount | No. of Payments | Payment Date |
|---|---|---|
| $0.00 | 2 | 10/01/2016 |
| $5,285.95 | 52 | 12/01/2016 |

24.    On or about October 1, 2019, 3FC defaulted under the terms of Modification 2 by failing to make the minimum monthly payment.

### *Continuing Guaranties - Brandon*

25.    Brandon executed multiple Continuing Guaranties (hereinafter the "Brandon Guaranties") for Agreements 1 and 2 (collectively the "Agreements"), attached collectively as **Exhibit E.**

26.    Pursuant to the Brandon Guaranties, Brandon agreed to the prompt payment and performance of all obligations, liabilities and undertakings of 3FC to BHB.

27.    Brandon, as personal guarantor of the debts of 3FC, has failed to cure the default of 3FC.

### *Continuing Guaranty-Ronald*

28.    Ronald executed multiple Continuing Guaranties (hereinafter the "Ronald Guaranties") for the Agreements, attached collectively as **Exhibit F.**

29.    Pursuant to the Ronald Guaranties, Ronald agreed to the prompt payment and performance of all obligations, liabilities and undertakings of 3FC to BHB.

30.    Ronald, as personal guarantor of the debts of 3FC, has failed to cure the default of 3FC.

### *Continuing Guaranty-Scott*

31.    Scott executed multiple Continuing Guaranties (hereinafter the "Scott Guaranties") for the Agreements, attached collectively as **Exhibit G.**

32.    Pursuant to the Scott Guaranties, Scott agreed to the prompt payment and performance of all obligations, liabilities and undertakings of 3FC to BHB.

5

33.     Scott, as personal guarantor of the debts of 3FC, has failed to cure the default of 3FC.

*__Continuing Guaranty-Tony__*

34.     Tony executed multiple Continuing Guaranties (hereinafter the "Tony Guaranties") for the Agreements, attached collectively as **Exhibit H**.

35.     Pursuant to the Tony Guaranties, Tony agreed to the prompt payment and performance of all obligations, liabilities and undertakings of 3FC to BHB.

36.     Tony, as personal guarantor of the debts of 3FC, has failed to cure the default of 3FC.

## COUNT I: BREACH OF CONTRACT (3FC INVESTMENTS, L.L.C)

37.     BHB incorporates by reference Paragraphs 1 through 36, as if set forth at length herein.

38.     BHB and 3FC entered into valid contracts (the Agreements), wherein 3FC agreed to make monthly payments to BHB for use of Equipment 1 and 2, collectively the "Equipment."

39.     3FC defaulted on the terms of the Agreements and therefore is in default for failure to pay.

40.     BHB sustained significant damages in the amount of $134,556.98, due to 3FC's breach and default of the Agreements.

**WHEREFORE,** Plaintiff, BMO Harris Bank N.A., demands the following relief against Defendant 3FC Investments, L.L.C compensatory damages in the amount of $134,556.98, as well as interest; reasonable attorneys' fees and costs; and such other relief as the Court may deem equitable and just.

6

## COUNT II: CONTINUING GUARANTIES (BRANDON FREED)

41. BHB incorporates by reference Paragraphs 1 through 40, as if set forth at length herein.

42. Brandon entered into valid written contracts with BHB (the Brandon Guaranties) to induce BHB to extend credit to 3FC, whereby he personally guaranteed 3FC's prompt payment of all amounts owed to BHB, including all of 3FC's then existing and future obligations, debts and liabilities to BHB.

43. Moreover, by executing the Brandon Guaranties, Brandon guarantied the repayment of all amounts due under the Agreements and expressly agreed, and is obligated, to pay BHB's reasonable attorney fees and cost of any action instituted upon 3FC's default.

44. BHB demanded from Brandon that he pay the full amount of 3FC's debts, i.e., $134,556.98, plus interest and fees.

45. Brandon defaulted on his contractual obligations by failing to pay said amount.

46. As a result of Brandon's default, BHB has sustained significant damages in the amount of $134,556.98, plus BHB's attorneys' fees, legal expenses, and other costs.

**WHEREFORE**, Plaintiff, BMO Harris Bank N.A., demands the following relief against Defendant Brandon Freed, compensatory damages in the amount of $134,556.98, as well as interest; reasonable attorneys' fees and costs; and such other relief as the Court may deem equitable and just.

## COUNT III: CONTINUING GUARANTIES (RONALD FREED)

47. BHB incorporates by reference Paragraphs 1 through 46, as if set forth at length herein.

48. Brandon entered into valid written contracts with BHB (the Ronald Guaranties) to induce BHB to extend credit to 3FC, whereby he personally guaranteed 3FC's prompt payment of

7

all amounts owed to BHB, including all of 3FC's then existing and future obligations, debts and liabilities to BHB.

49.     Moreover, by executing the Ronald Guaranties, Ronald guaranteed the repayment of all amounts due under the Agreements and expressly agreed, and is obligated, to pay BHB's reasonable attorney fees and cost of any action instituted upon 3FC's default.

50.     BHB demanded from Ronald that he pay the full amount of 3FC's debts, i.e., $134,556.98, plus interest and fees.

51.     Ronald defaulted on his contractual obligations by failing to pay said amount.

52.     As a result of Ronald's default, BHB has sustained significant damages in the amount of $134,556.98, plus BHB's attorneys' fees, legal expenses, and other costs.

**WHEREFORE**, Plaintiff, BMO Harris Bank N.A., demands the following relief against Defendant Ronald Freed, compensatory damages in the amount of $134,556.98, as well as interest; reasonable attorneys' fees and costs; and such other relief as the Court may deem equitable and just.

## COUNT IV: CONTINUING GUARANTIES (SCOTT COOPER)

53.     BHB incorporates by reference Paragraphs 1 through 52, as if set forth at length herein.

54.     Scott entered into valid written contracts with BHB (the Scott Guaranties) to induce BHB to extend credit to 3FC, whereby he personally guaranteed 3FC's prompt payment of all amounts owed to BHB, including all of 3FC's then existing and future obligations, debts and liabilities to BHB.

55.     Moreover, by executing the Scott Guaranties, Scott guaranteed the repayment of all amounts due under the Agreements and expressly agreed, and is obligated, to pay BHB's reasonable attorney fees and cost of any action instituted upon 3FC's default.

8

56.     BHB demanded from Scott that he pay the full amount of 3FC's debts, i.e., $134,556.98, plus interest and fees.

57.     Scott defaulted on his contractual obligations by failing to pay said amount.

58.     As a result of Scott's default, BHB has sustained significant damages in the amount of $134,556.98, plus BHB's attorneys' fees, legal expenses, and other costs.

**WHEREFORE**, Plaintiff, BMO Harris Bank N.A., demands the following relief against Defendant Scott Cooper, compensatory damages in the amount of $134,556.98, as well as interest; reasonable attorneys' fees and costs; and such other relief as the Court may deem equitable and just.

## COUNT V: CONTINUING GUARANTIES (TONY FORSON)

59.     BHB incorporates by reference Paragraphs 1 through 58, as if set forth at length herein.

60.     Tony entered into valid written contracts with BHB (the Tony Guaranties) to induce BHB to extend credit to 3FC, whereby he personally guaranteed 3FC's prompt payment of all amounts owed to BHB, including all of 3FC's then existing and future obligations, debts and liabilities to BHB.

61.     Moreover, by executing the Tony Guaranties, Tony guarantied the repayment of all amounts due under the Agreements and expressly agreed, and is obligated, to pay BHB's reasonable attorney fees and cost of any action instituted upon 3FC's default.

62.     BHB demanded from Tony that he pay the full amount of 3FC's debts, i.e., $134,556.98, plus interest and fees.

63.     Tony defaulted on his contractual obligations by failing to pay said amount.

64.     As a result of Tony's default, BHB has sustained significant damages in the amount of $134,556.98, plus BHB's attorneys' fees, legal expenses, and other costs.

9

**WHEREFORE**, Plaintiff, BMO Harris Bank N.A., demands the following relief against Defendant Tony Forson, compensatory damages in the amount of $134,556.98, as well as interest; reasonable attorneys' fees and costs; and such other relief as the Court may deem equitable and just.

Date:   June \_\_\_, 2021

Respectfully submitted,

Jordan M. Heiliger, MO Bar #69607
BQ & Associates, P.C., L.L.O.
14211 Arbor Street, Ste. 100
Omaha, NE  68144
Telephone:  (402) 554-4400
Fax: (402) 333-1151
ATTORNEYS FOR PLAINTIFF

10

# EXHIBIT A



# LOAN AND SECURITY AGREEMENT

The undersigned debtor, meaning all debtors jointly and severally ("**Debtor**"), to secure the obligations set forth herein grants to the Lender named below (with its successors and assigns, "**Lender**") under the terms and provisions of this agreement (this "**Agreement**") a security interest in the following property (with all present and future attachments, accessions, accessories, replacement parts, repairs and additions or substitutions, "**Equipment**"):

☒ **See Attached Schedule A**

## PAYMENT SCHEDULE

Debtor promises to pay Lender principal plus pre-computed interest and any administrative fee set forth below (the "**Total Amount**") of **$691,070.16** in **66** installments as follows:

(a) **$10,470.76** on **AUGUST 1, 2015** and a like sum on the like date of each month thereafter until fully paid.

(b) In irregular installments as follows:

# of Payments   Payment Amount   Payment Date

provided, however, that the final installment shall be in the amount of the then remaining unpaid balance plus any and all other accrued and unpaid sums due hereunder.

The interest under this Agreement is pre-computed. The Total Amount is calculated based on interest accruing at an interest rate of **6.25%** per annum based on a 360-day year of twelve 30-day months, plus the administrative fee, if any, spread over the life of the loan. The total cost of credit includes such accrued interest and the administrative fee of **$0.00** equating to an annual percentage rate of **6.25%** based on a 360-day year of twelve 30-day months. Late payments may affect the actual total amount payable due to payment of delinquency charges and/or increased accrued interest. If the Payment Schedule contains (i) a period of longer than a month before the first Payment Date (the excess number of days herein referred to as a "**Stub Period**") or (ii) any month or months in which a Payment Amount is either not due or is in an amount less than the accrued interest for such month (in either event, such period herein referred to as a "**Skip Period**"), then at the option of Lender, to the extent permitted by law, the unpaid and accrued interest for such Stub Period or Skip Period may be added to the unpaid principal amount hereunder and shall thereafter accrue interest at the interest rate set forth above.

**DELINQUENCY: FOR EACH INSTALLMENT NOT PAID WHEN DUE, DEBTOR AGREES TO PAY LENDER A DELINQUENCY CHARGE CALCULATED ON THE AMOUNT OF SUCH INSTALLMENT AT THE RATE OF 5% OF SUCH INSTALLMENT IF NOT PROHIBITED BY LAW, OTHERWISE AT THE HIGHEST RATE THAT DEBTOR CAN LEGALLY OBLIGATE ITSELF TO PAY AND/OR LENDER CAN LEGALLY COLLECT.**

## USE OF PROCEEDS

Lender is hereby irrevocably authorized and directed to disburse the proceeds of this Agreement as follows:

| Amount | Payee (Name and Address) |
|---|---|
| $583,030.32 | THE LARSON GROUP INC |
| | 4044 COYOTE DR |
| | JOPLIN, MO 64804 |
| | |
| | |
| | |
| | |
| | |

Disbursement may be made in Lender's name on Debtor's behalf or in Debtor's name. Disbursement in accordance with the above instructions or any written supplement to these instructions will constitute payment and delivery to and receipt by Debtor of all such proceeds.

**PAYMENT ADDRESS:** All amounts payable under this Agreement are payable at Lender's address shown below or at such other address as Lender may specify from time to time in writing. All written communication concerning disputed amounts, including any check or other payment instrument that (i) indicates that the written payment constitutes "payment in full" or is tendered as full satisfaction of a disputed amount or (ii) is tendered with other conditions or limitations (collectively a "**Disputed Payment**") must be mailed or delivered to us at the address for billing inquiries shown on the invoice or statement and not to the payment address.

### 1.0 THE EQUIPMENT

**1.1 Disclaimer.** LENDER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, AS TO THE QUALITY, WORKMANSHIP, DESIGN, MERCHANTABILITY, SUITABILITY, OR FITNESS OF THE EQUIPMENT FOR ANY PARTICULAR PURPOSE, OR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED. Debtor's obligations hereunder are absolute and unconditional notwithstanding the existence, location or condition of any item of Equipment or its suitability for use in Debtor's business.

**1.2 Equipment Receipt and Use.** Debtor warrants and agrees that: the proceeds of the loan and the Equipment will be used solely for business and commercial purposes; the Equipment is free from and will be kept free from all liens, claims, security interests and encumbrances other than that created hereby; Debtor will not, without Lender's prior written consent, sell, rent, lend, encumber, pledge, transfer, secrete or otherwise dispose of any of the Equipment, nor will Debtor permit any such act; the Equipment will be maintained in good operating condition, repair and appearance, and will be used and operated with care, only by qualified personnel in the regular course of Debtor's business; the Equipment shall remain personal property and not become part of any real property regardless of the manner of affixation; Lender may inspect the Equipment and all books and records relating to the Equipment or Debtor's performance under this Agreement at all reasonable times and from time to time; the Equipment will be kept at Debtor's place of business which is indicated immediately below Debtor's signature and will not be removed from said location without the prior written consent of Lender, except that an item of Equipment may be used away from said location in the regular course of Debtor's business provided that (a) such item is not removed from the United States (except for occasional use in Canada), and (b) if such item is not returned to said location within 30 days, Debtor will immediately upon Lender's request and each 30 days thereafter until the item is returned report the then current location thereof to Lender in writing.

**1.3 Insurance.** Debtor shall at all times bear all risk of loss of, damage to or destruction of the Equipment, and shall notify Lender if any of the Equipment is lost, damaged or destroyed. Debtor agrees to maintain insurance on the Equipment for the actual cash value thereof and for the life of this Agreement, covering all risks of physical loss or damage and such other risks as Lender may require, in form and amount and with insurers chosen by Debtor and satisfactory to Lender. Debtor agrees to deliver promptly to Lender certificates or, if requested, policies of insurance satisfactory to Lender, each with a standard long-form loss-payable endorsement naming Lender, its agent or such other party as Lender may from time to time instruct, and its successors and assigns, as loss-payee as their interests may appear. Each policy shall provide that Lender's interest therein will not be invalidated by the acts, omissions or neglect of anyone other than Lender, and shall provide that coverage may not be canceled or altered by the insurer except upon 30 days prior written notice to Lender. Lender's acceptance of policies in lesser amounts or risks will not be a waiver of Debtor's foregoing obligation. Debtor assigns to Lender all proceeds of any physical damage insurance maintained by Debtor with respect to the Equipment and any and all returned premiums, up to the amount owing hereunder by Debtor. Debtor directs all insurers to pay such proceeds directly to Lender and authorizes Lender to endorse Debtor's name to all remittances without the joinder of Debtor.

**1.4 Compliance With Law.** Debtor shall comply with all laws, rules and regulations applicable to Debtor and/or the operation of the Equipment, including without

Page 1 of 6 of Loan and Security Agreement dated JUNE 26, 2015 between 3FC INVESTMENTS, L.L.C. (Debtor) and GE CAPITAL COMMERCIAL INC. (Lender).
621700 - Fund off fax - MO-PPP
1.12T 10/2014
Doc Request ███████0001
PRICINGENGINE 1267334

ORIGINAL FOR GE CAPITAL

limitation, the USA PATRIOT Act and all laws, rules and regulations relating to import or export controls, anti-money laundering and terrorist financing.

## 2.0 SECURITY INTEREST

**2.1 Security Interest.** Debtor hereby grants to General Electric Capital Corporation, as agent for Lender and its Affiliates, and their respective successors and assigns, a first priority security interest in the Equipment to secure (a) payment of the Total Amount and all other obligations of Debtor to Lender under this Agreement, (b) the payment and performance of all other debts, liabilities and obligations of Debtor of every kind and character, whether now existing or hereafter arising, to Lender, whether under this Agreement or any other agreement, and (c) the payment and performance of all debts, liabilities and obligations of Debtor of every kind and character, whether now existing or hereafter arising, to each of Lender's Affiliates ("Liabilities"). For the purposes of this Agreement, an "Affiliate" of any party means and includes any direct or indirect parent, subsidiary or sister entity of that party and any successor or assign of any of them. Any sums at any time owing to Debtor and in the possession of Lender or any such Affiliate shall secure the Liabilities of Debtor to Lender and any Affiliate of them. Upon any assignment of this Agreement by Lender, the security interests granted herein will be assigned to and inure to the benefit of such assignee and the Affiliates of such assignee. The security interests granted herein shall continue to be effective regardless of any retaking or redelivery of the Equipment to Debtor.

**2.2 Perfection and Preservation of Security Interest.** Debtor agrees, at its own cost and expense: to do everything necessary or desirable to perfect and preserve the security interests granted hereunder; to extinguish or defend any action, proceeding or claim affecting the Equipment; and to pay promptly any taxes, assessments, license fees and other public or private charges when levied or assessed against the Equipment or this Agreement. Debtor authorizes Lender or an officer, employee or designee of Lender to file a financing statement describing the Equipment for itself and as representative of its Affiliates. Debtor agrees to execute and deliver to Lender, upon Lender's request, such documents, records and assurances as Lender deems necessary or advisable to confirm or perfect the security interest in the Equipment and Lender's rights hereunder.

**2.3 Location of Debtor.** (i) If Debtor is a registered organization, its state of organization is in the state set forth immediately below its signature on the last page of this Agreement and Debtor agrees that it will not change its form or state of organization without 30 days prior written notice to Lender. (ii) If Debtor is an individual, his/her principal place of residence is at the address set forth immediately below his/her signature on the last page of this Agreement and, if Debtor changes Debtor's principal residence, Debtor will notify Lender in writing of a change in his/her principal place of residence within 30 days of such change. Debtor agrees to reimburse Lender for all costs incurred by Lender related to any such change.

## 3.0 ACCOUNT MANAGEMENT AND PAYMENT PROCESSING

**3.1 Application of Payments.** All payments made by Debtor to Lender pursuant to this Agreement may be applied by Lender, in its sole and absolute discretion, to delinquency charges, interest and other such charges due hereunder, to principal due hereunder, and to any other Liabilities due hereunder or under any other agreement, in any order and manner selected by Lender. Debtor waives any right it may have to direct the application of any payments made by it to Lender, and Lender may at its option offset and deduct any liability or obligation of Debtor from any or all sums owed by it to Debtor.

**3.2 Debit Transactions.** Lender may but shall not be required to offer Debtor the option of paying any of Debtor's obligations to Lender through printed or electronic checks, drafts or charges ("Debit Transactions"). Each such Debit Transaction may be orally authorized to Lender, any representative or officer of Debtor or any other party having access to or control of the account upon which the Debit Transaction is to be charged. Debtor authorizes Lender or any officer, employee or designee of Lender to initiate Debit Transactions from Debtor's account in the orally authorized amount plus Lender's then Debit Transaction Fee. This authorization may be canceled at any time by Debtor giving at least three business days' prior written notice to Debtor's bank and Lender. Debtor authorizes Lender to substitute a Debit Transaction for any check or other remittance submitted by Debtor in the amount of that remittance. Payment by Debit Transactions is not required by Lender nor is its use a factor in the approval of credit.

**3.3 Acceptable Forms of Payment/Payment Processing.** Credit to Debtor's account may be delayed if payment is (a) not received at the address indicated on the related invoice or (b) not accompanied by Debtor's invoice number. Preferred forms of payment include direct debit, wires, company checks and certified checks. Payment in any other form may delay processing or be returned to Debtor. Delayed credit may cause Debtor to incur a late payment fee. All credit for payments of Debtor's account is subject to final payment by the institution on which the item of payment was drawn. Debtor hereby agrees that any payment, other than a Disputed Payment, made by Debtor by remittance and received by Lender at an address other than the address specified on the related invoice may be replaced, at Lender's option, by Lender with a substitute written or electronic instrument of equal amount and presented to Debtor's financial institution for payment from the account referenced on the remittance from Debtor.

**3.4 Returned Payments.** If a check, draft or other remittance sent by Debtor or a Debit Transaction authorized by Debtor is returned unpaid or rejected for any reason other than the lack of a proper endorsement by Lender, the application of such payment to Debtor's Liabilities will be reversed and Debtor shall immediately pay Lender the amount of such returned payment, plus any delinquency charge accruing as the result of such reversal. Debtor shall further pay Lender any amount charged to Lender by any depositary institution because of such return and an additional handling charge in the amount of $20, or if applicable law limits or restricts the amount of such reimbursement and/or handling charge, the amounts chargeable under this provision will be limited and/or restricted in accordance with applicable law.

**3.5 Authorization to Share Information.** Lender may receive from and disclose to any individual, corporation, business trust, association, company, partnership, joint venture, or other entity (collectively, the "Entity"), including, without limiting the generality of the foregoing, any Affiliate of Lender and any credit reporting agency or other entity whether or not related to Lender for any purpose, information about Debtor's accounts, credit application and credit experience with Lender and Debtor authorizes any Entity to release to Lender or any Affiliate of Lender any information related to Debtor's accounts, credit experience and account information regarding Debtor. This shall be continuing authorization for all present and future disclosures of Debtor's account information, credit application and credit experience on Debtor made by Lender, or any Entity requested to release such information to Lender.

**3.6 Maximum Interest Rate.** The parties hereto intend to comply with any applicable usury laws. Accordingly, they agree that, any provisions in this Agreement or any other agreement, document or communication to the contrary notwithstanding, this Agreement shall in no event require the payment or permit the collection of interest or any amount in the nature of interest or fees (collectively "Interest Amount") in excess of the maximum amount permitted by applicable law as now or hereafter construed by a court of competent jurisdiction. If any such excess Interest Amount is contracted for, charged or received pursuant to this Agreement, or if all of the principal balance under this Agreement shall be prepaid, or if the maturity of any amount under this Agreement is accelerated, so that under any of such circumstances or any other circumstance whatsoever the Interest Amount contracted for, charged or received shall exceed the maximum amount of interest permitted by applicable law as so construed, then in such event: (a) the Interest Amount hereunder shall be limited to the maximum amount lawfully permitted, and (b) any excess Interest Amount that may have been received shall, at Lender's option, be credited to the unpaid principal balance of the loan as a prepayment of principal, without any prepayment fee, or refunded to Debtor, and the effective interest rate (taking into account all Interest Amounts) shall automatically be reduced to the maximum lawful rate allowed under applicable law as now or hereafter construed by a court of competent jurisdiction. Without limiting the foregoing, all calculations of the interest rate (taking into account all Interest Amounts) contracted for, charged or received with respect to this Agreement which are made for the purpose of determining whether such rate exceeds the maximum lawful rate, shall be made, to the fullest extent permitted by applicable law, by amortizing, prorating, allocating and spreading in equal parts during the period of the full stated term of the indebtedness, all interest Amounts at any time contracted for, charged to or received from Debtor in connection with such indebtedness.

## 4.0 PERFORMANCE BY LENDER

**4.1 Performance.** If Debtor fails to perform any of its obligations hereunder, Lender may, but shall not be obligated to, perform the same for the account of Debtor to protect the interest of Lender or Debtor or both, at Lender's option. Debtor shall immediately repay to Lender any amounts paid by Lender together with interest thereon at the rate payable upon acceleration of Debtor's obligations under this Agreement. Performance by Lender will not constitute a waiver of any default by Debtor.

**4.2 Power of Attorney.** DEBTOR HEREBY APPOINTS LENDER OR ANY OFFICER, EMPLOYEE OR DESIGNEE OF LENDER AS DEBTOR'S ATTORNEY-IN-FACT TO, IN DEBTOR'S OR LENDER'S NAME: (a) PREPARE, EXECUTE AND SUBMIT ANY NOTICE OR PROOF OF LOSS IN ORDER TO REALIZE THE

Page 2 of 6 of Loan and Security Agreement dated JUNE 26, 2015 between 3FC INVESTMENTS, L.L.C. (Debtor) and GE CAPITAL COMMERCIAL INC. (Lender).
621700 - Fund off fax - MO-PPP
1.12T 10/2014
Doc Request #            0001
PRICINGENGINE 1267334

ORIGINAL FOR GE CAPITAL

DocuSign Envelope

BENEFITS OF ANY INSURANCE POLICY INSURING THE EQUIPMENT; (b) PREPARE, EXECUTE AND FILE ANY AGREEMENT, DOCUMENT, FINANCING STATEMENT, TITLE APPLICATION, INSTRUMENT (OR ANY OTHER WRITING OR RECORD) THAT, IN LENDER'S OPINION, IS NECESSARY TO PERFECT AND/OR GIVE PUBLIC NOTICE OF THE INTERESTS OF LENDER IN ANY EQUIPMENT; AND (c) ENDORSE DEBTOR'S NAME ON ANY REMITTANCE REPRESENTING PROCEEDS OF ANY INSURANCE RELATING TO THE EQUIPMENT OR THE PROCEEDS OF THE SALE, LEASE OR OTHER DISPOSITION OF THE EQUIPMENT (WHETHER OR NOT THE SAME IS A DEFAULT HEREUNDER). This power is coupled with an interest and is irrevocable as long as any Liabilities remain unpaid.

**5.0    DEFAULT AND REMEDIES**

**5.1    Events of Default.** Time is of the essence. An event of default shall occur if: (a) Debtor fails to pay when due any amount owed by it to Lender or any Affiliate of Lender under this Agreement; (b) Debtor or a Guarantor fails to pay any Liabilities when due to Lender or any Affiliate of Lender or is otherwise in default under any other document, agreement or instrument; (c) Debtor or a Guarantor defaults under the terms of any secured indebtedness or indebtedness of a material amount to any other party; (d) Debtor or a Guarantor fails to perform or observe any other term or provision to be performed or observed by it hereunder or under any other instrument or agreement furnished by Debtor or a Guarantor to, or otherwise acquired by, Lender or any Affiliate of Lender; (e) (i) Debtor or a Guarantor becomes insolvent, ceases to do business as a going concern, makes an assignment for the benefit of creditors, or takes advantage of any law for the relief of debtors, or (ii) a petition in bankruptcy or for an arrangement, reorganization, or similar relief is filed by or against Debtor or a Guarantor, or (iii) any property of Debtor or a Guarantor is attached, or a trustee or receiver is appointed for Debtor or a Guarantor or for substantial part of its property, or Debtor or a Guarantor applies for such appointment; (f) any of the Equipment is lost or destroyed; (g) there shall occur an appropriation, confiscation, retention, or seizure of control, custody or possession of any Equipment by any governmental authority, governmental agency or instrumentality (such entities, agencies and instrumentalities, collectively, "Governmental Authority"); (h) Debtor or anyone in the control, custody or possession of any Equipment is accused, alleged or charged by any Governmental Authority to have used any Equipment in connection with the commission or any crime (other than a misdemeanor moving violation); (i) there shall be a material adverse change in any of the (A) condition (financial or otherwise), business performance, prospects, operations or properties of Debtor or a Guarantor, (B) legality, validity or enforceability of this Agreement (C) perfection or priority of the lien granted in favor of Lender pursuant to this Agreement, or (D) ability of the Debtor to repay the indebtedness or perform its obligations under this Agreement; (j) rights and remedies of Lender under this Agreement are impaired; (k) there shall be a death of majority owner of Debtor or a Guarantor, or Lender or as otherwise granted herein.

**5.2    Remedies.** Upon the occurrence of an event of default, and at any time thereafter as long as the default continues, Lender may, at its option, with or without notice to Debtor (i) declare this Agreement to be in default, (ii) declare the indebtedness hereunder to be immediately due and payable, (iii) declare all other debts then owing by Debtor to Lender to be immediately due and payable, and (iv) exercise all of the rights and remedies of a secured party under the Uniform Commercial Code and any other applicable laws, including the right to require Debtor to assemble the Equipment and deliver it to Lender at a place to be designated by Lender and to enter any premises where the Equipment may be without judicial process and take possession thereof. Any property other than Equipment that is in or upon the Equipment at the time of repossession may be taken and held without liability. Any requirement that Lender give reasonable notice regarding the sale or other disposition of Equipment will be met if such notice is mailed to Debtor at its last known address at least ten days before such sale or other disposition. Lender may dispose of any Equipment at a public or private sale or at auction. Lender may buy at any sale and become the owner of the Equipment. Debtor agrees that Lender may bring legal proceedings to enforce the payment and performance of Debtor's obligations hereunder in any court in the State shown in Lender's address set forth herein, and service of process may be made upon Debtor by mailing a copy of the summons to Debtor at its address shown herein. Debtor shall also pay to Lender all expenses of retaking, holding, preparing for sale, selling and the like, including without limitation (a) the reasonable fees of any attorneys retained by Lender, and (b) all other legal expenses incurred by Lender. Debtor agrees that Debtor is liable for any deficiency remaining after any disposition of Equipment after default. Lender may sell the Equipment without giving any warranties as to the Equipment. Lender may disclaim any warranties of title, possession, quiet enjoyment, or the like. This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Equipment.

**5.3    Acceleration Interest.** Debtor agrees to pay Lender, upon acceleration of the above indebtedness, interest on all sums then owing hereunder at the rate of 1 1/2% per month if not prohibited by law, otherwise at the highest rate Debtor can legally obligate itself to pay or Lender can legally collect under applicable law.

**6.0    PREPAYMENT**

**6.1    Partial Prepayment and Reschedule.** (a) Debtor does not have the right to prepay only a portion of the balance of this Agreement prior to maturity. (b) If there are several units subject to this Agreement and Lender either (i) requires (as a result of a casualty loss) or (ii) permits all indebtedness that relates to a specific unit to be paid in full, Lender will apply the proceeds identified as relating thereto to the balance due under this Agreement and reschedule the remaining indebtedness under this Agreement over the then remaining term in accordance with the provisions set forth below. (c) If Lender receives one or more remittance(s) in an aggregate amount in excess of the amounts then due and unpaid under this Agreement (other than any amounts paid pursuant to 6.1(b) above) ("Excess Remittances") Lender may, at its option: (i) apply any portion of such Excess Remittances (A) in payment of obligations then due or past due under any other agreement Debtor has with Lender, (B) to the balance due under this Agreement in any manner selected by Lender, with or without rescheduling the remaining indebtedness over the then remaining term; or (ii) return such excess amount to Debtor at its last known address. (d) The Interest included in this Agreement is precomputed and accrues in arrears; accordingly, early payment of one or more installments prior to their maturity date may not reduce the total interest payable by Debtor under this Agreement unless Lender reschedules the remaining payments. If Lender reschedules the indebtedness under this Agreement, Lender will deduct the unaccrued portion of interest on the unpaid balance under this Agreement at the time of reschedule (which the parties agree shall be deemed to have been made and shall be effective as of the next scheduled due date (the "Effective Reschedule Date") calculated using any method selected by Lender as permitted by applicable law, and recalculate precomputed interest on such unpaid balance as of the Effective Reschedule Date. Debtor will not receive any rebate of, or credit for, interest relating to any period prior to the Effective Reschedule Date. (e) If Lender permits Debtor to make a partial prepayment pursuant to clause (b)(ii) of this Section, Debtor agrees that it will at the time of such prepayment pay a prepayment fee equal to the pro rata portion of the prepayment fee that would have been paid pursuant to Section 6.2 below if Debtor had prepaid the indebtedness under this Agreement in full, computed based on the percentage of the outstanding Total Amount being prepaid (for purposes of calculating the outstanding Total Amount, no effect shall be given to any prior prepayments).

**6.2    Prepayment in Full.** Subject to the terms of this provision, Debtor may prepay the indebtedness under this Agreement in full (but not in part) at any time, so long as Debtor is not in default hereunder; provided, however, that any prepayment that is not paid on a scheduled payment due date shall be deemed to have been made and shall be effective as of the next scheduled due date (the "Effective Prepayment Date"). If the prepayment is made prior to the last twelve months of the contract (as originally scheduled or if extended, as extended), Debtor shall pay a prepayment fee equal to the lesser of (a) $15.00, and (b) the maximum prepayment and/or acquisition charge allowed by applicable law. Debtor and Lender acknowledge and agree that the prepayment fee is a reasonable estimate of the actual or anticipated harm sustained by Lender for Debtor's prepayment of the Total Amount. For purposes of calculating the prepayment amount and any prepayment fee, any unearned interest that would accrue after the Effective Prepayment Date shall be excluded from the calculation of the Total Amount outstanding as of the Effective Prepayment Date. Debtor will not receive any rebate of, or credit for, interest relating to any period prior to the Effective Prepayment Date. Debtor agrees that all accrued and unpaid late charges and other amounts due from Debtor under this Agreement will be paid concurrently with any such prepayment.

**7.0    ASSIGNMENT AND GENERAL PROVISIONS**

**7.1    Chattel Paper.** The only copy of this Agreement that constitutes "Chattel Paper" for all purposes of the Uniform Commercial Code is the copy marked "ORIGINAL FOR GE CAPITAL" which is delivered to and held by GE Capital.

**7.2    Assignment and Waiver.** This Agreement may not be assigned by Debtor without the prior written consent of Lender. Lender may sell, transfer or assign any or all rights under this Agreement or sell participations herein without notice to, acknowledgment of, or consent from Debtor. Debtor hereby (a) consents to such assignment or participation and agrees not to assert against Lender or any such assignee or participant any claims, counterclaims, claims in recoupment, abatement, reduction, defenses, or set-offs for breach of warranty or for any other reason which Debtor could assert against Debtor, Lender, any such assignee or participant or the

Page 3 of 6 of Loan and Security Agreement dated JUNE 26, 2015 between 3FC INVESTMENTS, L.L.C. (Debtor) and GE CAPITAL COMMERCIAL INC. (Lender).
621700 - Fund off fax - MO-PPP
1.12T 10/2014
Doc Request :        0001
PRICINGENGINE 1267334                                        ORIGINAL FOR GE CAPITAL

manufacturer of the Equipment, except defenses which cannot be waived under the Uniform Commercial Code; and (b) agrees to make and/or settle any and all claims with regard to the Equipment directly and exclusively against with the manufacturer. Debtor agrees that no assignee or participant will have any obligations or liabilities under this Agreement to Debtor or to any other person by reason of any assignment or participation. Debtor hereby waives any right of set-off Debtor may now or hereafter have against Lender or any assignee of or participant in this Agreement. Upon Lender's assignment of Lender's entire interest in this Agreement, Lender shall be relieved, from and after the date of such assignment, of any liability for the performance of any obligation of Lender contained in this Agreement or any document executed in conjunction with this Agreement.

7.3     **General.** (a) Waiver of any default shall not be a waiver of any other default. (b) All of Lender's rights are cumulative and not alternative. (c) No waiver or change in this Agreement shall bind Lender unless in writing signed by one of its authorized representatives. (d) Any provision hereof contrary to, prohibited by or invalid under applicable laws or regulations shall be inapplicable and deemed omitted herefrom, but shall not invalidate the remaining provisions hereof. (e) Debtor authorizes Lender to correct patent errors herein and to make changes to this Agreement or to any related schedule that benefit Debtor. In addition, if the funding amount Debtor requests Lender to disburse exceeds the principal portion of the Total Amount due to changes in calculation of taxes, configuration of the Equipment or other factors affecting the cost of the Equipment, and if such an increase is within the limits of Lender's credit approval, Debtor authorizes Lender, upon written notice to Debtor, to increase the principal portion of the Total Amount by not more than fifteen percent and adjust the Total Amount and the installment amounts payable under this Agreement or any related schedule accordingly. (f) Any captions to the provisions of this Agreement are for convenience only and do not limit or affect the application or interpretation of this Agreement. (g) All of the terms and provisions of this Agreement shall apply to and be binding upon Debtor and its heirs, personal representatives, successors and assigns and shall inure to the benefit of Lender and its successors and assigns. (h) The acceptance by Lender of any remittance from a party other than Debtor shall in no way constitute Lender's consent to the transfer of any of the Equipment to such party. (i) Debtor represents and warrants that there is no material pending or threatened investigation by any governmental authority, litigation or other legal proceeding against or involving Debtor. (j) So long as Debtor's financial statements remain unpaid or unperformed, Debtor will provide Lender with such financial information as Lender may reasonably request, including copies of any of the Liabilities remains unpaid or unperformed, Debtor will provide Lender with such financial information as Lender may reasonably request, including copies of Debtor's financial statements within 30 days of the end of each of Debtor's fiscal quarters and within 90 days after the end of each of Debtor's fiscal years. Such financial statements shall be prepared in accordance with GAAP and on the same basis (reviewed, audited, etc.) as Debtor's financial statements are currently prepared unless advised by Lender otherwise, at which time Debtor will comply with Lender's request. Debtor represents and warrants that all financial statements delivered will present fairly the financial condition and results of operations and cash flows of the Debtor as of the dates thereof and for the periods then ended. (k) Lender may pay fees to or receive fees from the seller or manufacturer of the Equipment, a broker, or other third party in connection with this Agreement. Such fees may affect the rate, terms and Debtor's total cost hereunder. (l) Debtor hereby agrees to indemnify, defend and hold harmless Lender and its Affiliates and respective principals, directors, officers, employees, representatives, agents and third-party advisors from and against any and all losses, disputes, claims, expenses (including, without limitation, legal expenses), damages and liabilities of whatsoever kind and nature arising out of, in connection with, or relating to the Equipment, this Agreement or any other document related hereto. If allowed by law, the legal expenses shall include the amount of any flat fee, retainer, contingent fee or the hourly charges of any attorney retained by Lender in enforcing any of Lender's rights hereunder or in the prosecution or defense of any litigation related to this Agreement or the transactions contemplated by this Agreement. This indemnification shall survive the termination or expiration of this Agreement.

7.4     **Additional Covenants and Oral Agreement.** THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

7.5     **Waiver of Trial By Jury.** LENDER AND DEBTOR HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION RELATING TO THIS AGREEMENT. LENDER AND DEBTOR HEREBY, FOR THEMSELVES, THEIR SUCCESSORS AND ASSIGNS, WAIVE ANY RIGHT TO SUE FOR OR COLLECT FROM THE OTHER PARTY ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OF ANY CHARACTER AS A RESULT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR THE ENFORCEMENT BY EITHER PARTY OF ITS RIGHTS UNDER THIS AGREEMENT EXCEPT TO THE EXTENT THAT ANY SUCH DAMAGES ARE PROVEN TO BE THE DIRECT RESULT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE OTHER PARTY.

7.6     **Governing Law/Choice of Venue.** Anything in this Agreement to the contrary notwithstanding, the transactions contemplated by this Agreement shall be deemed approved and entered into within the State of Utah and all credit or other financial accommodations extended by Lender under this Agreement shall be deemed extended from and subject to the laws of the State of Utah (without regard to the conflicts of law principles of such State) regardless of the location of Debtor or any of the Equipment. Any legal action or proceeding with respect to this Agreement or the transactions contemplated by this Agreement shall be brought exclusively in the federal or state courts located in the State of Utah, and Debtor accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts; provided, however, that nothing in this Agreement shall limit or restrict the right of Lender to commence any proceeding in the federal or state courts located in the state in which the Equipment is located to the extent Lender deems such proceeding necessary or advisable to exercise remedies available under this Agreement or to commence legal proceedings or otherwise proceed against Debtor in any other jurisdiction. Lender and Debtor hereby irrevocably waive any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions.

7.7     **Execution and Transmission of Documentation.** This Agreement and any schedules, exhibits, annexes or related instruments (each an "Instrument") will be created and evidenced as follows: (i) we, Lender, will deliver to you, Debtor, an electronic or paper version of each Instrument; (ii) you will print and sign (and initial where indicated), using either ink on paper (a "manual" signature) or, if instructed or expressly permitted by us in writing, by electronic or digital means (an "electronic" signature), the signature page of each Instrument and deliver the same to us by electronic, facsimile or other means; (iii) we will sign (electronically, digitally or manually, at our option) each signature page so delivered by you (if the Instrument requires our signature); and (iv) we will attach each fully signed signature page to an electronic or printed paper copy of the applicable Instrument. You hereby represent and warrant that you have not modified the Instrument sent to you for signature. Upon your one-time request for a copy of any fully signed Instrument promptly after it has been produced by this process, we will make the same available to you by electronic or other means. Each Instrument produced by this process will be conclusively presumed to be identical to the version signed or initialed by you, and we may (at our option) retain only a copy of such Instrument and dispose of the version containing your manual signature. We both intend that each Instrument produced by this process shall be for all purposes (including perfection of security interests and admissibility of evidence) the sole original authenticated Instrument; and to the extent, if any, that any Instrument constitutes chattel paper (as the term is defined in the applicable Uniform Commercial Code), no security interest in such Instrument may be created through the transfer or possession of any counterpart or copy thereof, other than the Instrument produced by this process. You agree not to raise as a defense to the enforcement of any Instrument that you executed such Instrument by electronic or digital means or used facsimile or other electronic means to transmit your signature on such Instrument. Notwithstanding anything to the contrary herein, we reserve the right to require you to sign any Instrument manually and to deliver to us an original of such Instrument containing your manual signature.

Page 4 of 6 of Loan and Security Agreement dated JUNE 26, 2015 between 3FC INVESTMENTS, L.L.C. (Debtor) and GE CAPITAL COMMERCIAL INC. (Lender).
621700 - Fund off fax - MO-PPP
1.12T  10/2014
Doc Request █████████ 0001
PRICINGENGINE 1267534

ORIGINAL FOR GE CAPITAL

Case 3:21-cv-05056-DPR   Document 1   Filed 06/16/21   Page 15 of 45

DocuSign Envelope ID: █████████████████████

## IMPORTANT INFORMATION ABOUT ESTABLISHING A RELATIONSHIP WITH GE CAPITAL

To help the United States Government fight terrorism and money laundering, Federal law requires us to obtain, verify, and record information that identifies each person or business that opens an account or establishes a relationship. What this means for you: when you open an account or establish a relationship, we will ask for your name, street address, date of birth, and identification number, such as a social security number or taxpayer identification number. For businesses, we will ask for the business name, street address and tax identification number. Federal law requires us to obtain this information. We may also ask to see your driver's license or other identifying documents that will allow us to identify you. We appreciate your cooperation.

## DELIVERY AND ACCEPTANCE OF EQUIPMENT
### (Check Appropriate Box)

Debtor's obligations and liabilities to Lender are absolute and unconditional under all circumstances and regardless of any failure of operation or Debtor's loss of possession of any item of Equipment or the cessation or interruption of Debtor's business for any reason whatsoever.

☒ On **JUNE 26, 2015**, the Equipment being purchased with the proceeds of this Agreement was delivered to Debtor with all installation and other work necessary for the proper use of the Equipment completed at a location agreed upon by Debtor; the Equipment was inspected by Debtor and found to be in satisfactory condition in all respects and delivery was unconditionally accepted by Debtor.

☐ The Equipment being purchased with the proceeds of this Agreement has not yet been delivered to or accepted by Debtor and, upon delivery, Debtor agrees to execute such delivery and acceptance certificate as Secured Party requires.

☐ All of the Equipment was acquired by Debtor prior to the date hereof and was previously delivered to and unconditionally accepted by Debtor.

Dated:    **JUNE 26, 2015**

Debtor(s) hereby acknowledge(s) receipt of an exact copy of this contract.

Lender:    **GE CAPITAL COMMERCIAL INC.**

By:    *Wardlaw, Brandon*

Name:    Wardlaw, Brandon

Title:    **AUTHORIZED SIGNER**

**300 E. JOHN CARPENTER FREEWAY**
*(Street Address)*
**IRVING, TEXAS 75062-2712**
*(City, State and Zip Code)*

Debtor:    **3FC INVESTMENTS, L.L.C.**

By: _____

Name:    **BRANDON FREED**

Title:    **MANAGING MEMBER**

State of Organization:    **MO**

Principal Residence/Chief Executive Office/Place of Business:
**615 SOUTH ELLIOTT ST**
*(Street Address)*
**WEBB CITY, MO 64870**
*(City, State and Zip Code)*

Billing/Invoice Address:

_____

_____
*(Address)*

_____
*(City, County, State and Zip Code)*

When not in use, the Equipment will be kept at:

**615 SOUTH ELLIOTT ST**
*(Equipment Street)*
**WEBB CITY, JASPER, MO 64870**
*(Equipment City, County, State, and Zip)*

Page 5 of 6 of Loan and Security Agreement dated JUNE 26, 2015 between 3FC INVESTMENTS, L.L.C. (Debtor) and GE CAPITAL COMMERCIAL INC. (Lender).
621700 - Fund off fax - MO-PPP
1.12T 10/2014
Doc Request: ████0001
PRICINGENGINE 1267334

ORIGINAL FOR GE CAPITAL

DocuSign Envelope ID: 87515EC7-C44C-483F-B4A3-2DB0C99E14A8

# SCHEDULE A

Attached to and made a part of a _____ **LOAN AND SECURITY AGREEMENT** _____ dated _**JUNE 26, 2015**_

(Name of document, such as Security Agreement)

between 3FC INVESTMENTS, L.L.C. and GE CAPITAL COMMERCIAL INC..

(Describe property fully, including year if appropriate, make, model, kind of unit, serial number and any other pertinent information.)

| Year | Manufacturer | Model | Description | Serial Number |
|------|-------------|-------|-------------|---------------|
| 2016 | PETERBILT | 579 | 579 | 1XPBDP9X1GD340295 |
| 2016 | PETERBILT | 579 | 579 | 1XPBDP9X6GD340292 |
| 2016 | PETERBILT | 579 | 579 | 1XPBDP9X8GD340293 |
| 2016 | PETERBILT | 579 | 579 | 1XPBDP9XXGD340294 |

3FC INVESTMENTS, L.L.C.

BY:  X _____

Name: _BRANDON FREED_

TITLE: _MANAGING MEMBER_

COPY VIEW

Page 6 of 6 of Loan and Security Agreement dated JUNE 26, 2015 between 3FC INVESTMENTS, L.L.C. (Debtor) and GE CAPITAL COMMERCIAL INC. (Lender).
621700 - Fund off fax - MO-PPP
1.12T 10/2014
Doc Request : ███0001
PRICINGENGINE 1267334

ORIGINAL FOR GE CAPITAL

# EXHIBIT B

**BMO Harris Bank N.A.**

JOEL DONNER
ACCOUNT MODIFICATION SPECIALIST
1010 THOMAS EDISON BLVD SW
CEDAR RAPIDS, IA 52404, USA
Tel: 319-841-7722
Fax: 866-441-0068
JOEL.DONNER@BMOTF.COM

3FC INVESTMENTS, LLC
P.O. BOX 3751
JOPLIN, MO 64803
RE ████████████████████

OCTOBER 11, 2016

Dear Sir/Madam:

Please find enclosed Reschedule Agreement document(s) regarding the above-mentioned account(s). Your new payment schedule is outlined in the agreement. The Reschedule Charge is the interest that is being charged due to the reschedule.

Please sign and return the modification agreement along with a copy of this letter to me at:

Email – Joel.Donner@BMOTF.com
Fax – 866-441-0068

We must receive these documents by OCTOBER 18, 2016 to process your reschedule promptly.

Sincerely,

JOEL DONNER
ACCOUNT MODIFICATION SPECIALIST

# MODIFICATION AGREEMENT
## (Precomputed – 2 Party)



This Modification Agreement (this "Modification Agreement") is made by and between 3FC INVESTMENTS, LLC ("Debtor") and BMO HARRIS BANK N.A. (together with its successors and assigns, "Bank") and any guarantor, co-debtor or endorser signing below.

WHEREAS, Debtor entered into that certain security agreement dated **JUNE 26, 2015** (herein with all amendments, attachments, riders, modifications and any accompanying notes, referred to as the "Contract") which was executed by Debtor as evidence of and security for the payment of the amounts set forth therein;

WHEREAS, **Bank** is either the original secured party under the Contract, together with any related guaranties and other related instruments and documents, or all such agreements have been assigned to and are now owned by Bank;

WHEREAS, Debtor has requested that Bank modify the terms of the Contract, and Bank will agree to reschedule the balance of the Contract only if the terms and conditions of this Modification Agreement are fully complied with; and

WHEREAS, the parties agree that this Modification Agreement shall be made a part of and specifically incorporated into the Contract.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follow:

1.
| | | | |
|---|---|---|---|
| (a) Unpaid Balance of Contract (Principal and Finance Charges) | | $554,950.77 | |
| (b) Deduct: Finance Charge Refund | | $79,053.55 | |
| (c) Total of (a) minus (b) | | | $475,897.22 |
| (d) Add: | | | |
| (i) Official fees | | $0.00 | |
| (ii) Other | | $0.00 | |
| (iii) Total additions | | | $0.00 |
| (e) Rescheduled Principal Balance: Total of (c) plus (d) | | | $475,897.22 |
| (f) Rescheduled Finance Charges | | | $74,225.34 |
| (g) Rescheduled Balance of Contract: (e) plus (f) | | | $550,122.56 |
| (h) Rescheduling Fee | | | $0.00 |
| (i) Accrued but unpaid delinquency and collections charges | | | $1,670.62 |

2. Debtor promises and agrees to pay to Bank the Reschedule Balance of Contract (item 1(g) above) of $550,122.56 in 54 installments as follow:

| | | | |
|---|---|---|---|
| *For equal successive monthly installments* | $0.00 | on | _____ |
| | | | (Date) |

and a like sum on the like date of each month thereafter until fully paid, provided, however, that the final installment shall be in the amount of the remaining unpaid balance.

| *For other than successive monthly installments* | Payment Amount | No. of Payments | Payment Date |
|---|---|---|---|
| | $0.00 | 2 | 10/01/2016 |
| | $10,579.28 | 52 | 12/01/2016 |

The Rescheduled Finance Charges (item 1(f) above) under this Modification Agreement are precomputed and calculated based on an interest rate of 6.25% per annum, exclusive of any fees, costs or the Rescheduling Fee, if any (item 1(h) above). The calculation of interest and is calculated using a 360-day year of twelve 30-day months, unless otherwise provided in the Contract. Late payments may affect the total payments due as a result of increased late charges.

680015 MOD LOAN 2P PC 09/2011 1.00
Page 2 of 3
Credit ApplD:
Doc Request:

3.  Debtor promises to pay **Bank** the accrued but unpaid delinquency and collection charges (item 1(i) above) and the Rescheduling Fee (item 1(h above) as follows:

*Upon execution of*  The amount of $0.00 upon execution of this Modification Agreement.
*Modification Agreement*

*On or before final payment*  The amount of $1,570.62 on or before the due date of the final payment under the Contract, as herein modified.

*By an agreed upon Schedule*   **Payment Amount**          **No. of Payments**          **Payment Date**

Delinquency and collection charges accrued after the execution of the Modification Agreement shall be paid in accordance with the terms and conditions of the Contract

4.  All payments should be made to the following address (the "Payment Address"); PO BOX 71951, CHICAGO, IL, 60694-1951.

5.  This Modification Agreement is not a novation of the Contract. Except as specifically modified hereby, the terms and provisions of the Contract shall remain in full force and effect. No oral agreement, guaranty, promise, representation or warranty shall be binding on Bank. If any portion or provision of this Modification Agreement is deemed unenforceable in any respect, then and in such case, the parties agree that such portion or provision shall be inapplicable and deemed omitted herefrom, but shall not invalidate the remaining provisions of this Modification Agreement or the Contract.

6.  Debtor acknowledges and agrees that any security interest previously granted under the Contract in and to the Collateral described therein shall continue to secure the amounts owing under the Contract, as modified hereby. Nothing in this Modification Agreement shall waive any late fees that are due and owing by the Debtor at the time of this Modification Agreement.

7.  **Reaffirmation of Contract.** DEBTOR HEREBY REAFFIRMS ALL PAYMENT AND PERFORMANCE OBLIGATIONS TO BANK CONTAINED IN THE CONTRACT AS AMENDED AND ANY AND ALL CREDIT SUPPORT DOCUMENTS, AND ALL TERMS, COVENANTS AND CONDITIONS THEREOF. DEBTOR ACKNOWLEDGES AND REPRESENTS THAT DEBTOR HAS NO VALID DEFENSE, SETOFF, RECOUPMENT, ABATEMENT, OR COUNTER CLAIM TO THE PAYMENT OF ANY SUMS DUE, OR TO PERFORMANCE OF ANY OBLIGATIONS, UNDER THE CONTRACT AND CREDIT SUPPORT DOCUMENTS, OR ANY OF THEM, NOR DOES DEBTOR HAVE ANY VALID CLAIMS AGAINST BANK OR ITS PREDECESSORS-IN-INTEREST OR ASSIGNORS, OR LEGAL OR EQUITABLE RIGHTS IN REGARD TO ENFORCEMENT OF THE OBLIGATIONS OF DEBTOR BY BANK UNDER THE CONTRACT AND CREDIT SUPPORT DOCUMENTS, OR ANY OF THEM, AND DEBTOR SPECIFICALLY WAIVES AND RELINQUISHES ANY SUCH RIGHTS OR CLAIMS.

8.  Credit to Debtor's account(s) may be delayed if payment is (a) not received at the Payment Address or (b) not accompanied by Debtor's invoice number. Preferred forms of payment include Direct Debit, Wires, Company Checks and Certified Checks. Payment in any other form may delay processing or be returned to Debtor. Delayed credit may cause Debtor to incur a late payment fee. All credit for payments of Debtor's account(s) are subject to final payment by the institution on which the item of payment was drawn. All written communication concerning disputed amounts, including any check or other payment instrument that (i) indicates that the written payment constitutes "payment in full" or is tendered as full satisfaction of a disputed amount or (ii) is tendered with other conditions or limitation ("Disputed Payments") must be mailed or delivered to Bank at the address for billing inquiries shown on the invoice or statement and not to the Payment Address.

9.  Bank's agreement to the aforesaid rescheduling is expressly made subject to and conditioned upon all Guarantors of Debtor's obligations under the Contract executing one or more counterparts of this Modification Agreement in the space provided to evidence their consent and agreement as set forth below. This Modification Agreement will not become effective unless and until accepted and signed by Bank. This Modification Agreement shall be binding upon and inure to the benefit of all the parties hereto and their respective administrators, successors and permitted assigns. Each of the parties executing this Modification Agreement acknowledges receipt of a copy hereof.

10. This Modification Agreement will be created and evidenced as follows: (i) Bank will deliver to Debtor and each Guarantor an electronic or paper version of each document to be signed by the parties, including any schedules, exhibits or related documents (each, a "Document"); (ii) Debtor and each Guarantor will print and manually sign the signature page of each Document and deliver to Bank by facsimile, scan or other means the signed Document; (iii) Bank will manually sign each signature page of each Document received from Debtor and each Guarantor; and (iv) Bank will attach each fully signed signature page to a printed paper copy of the applicable Document. By signing and transmitting a Document to Bank, Debtor and each Guarantor confirm their intent to sign such Document and accept its terms. If the Debtor and each

Guarantor sign different counterparts of the signature page, all of such counterparts along with the signature page signed by Bank together constitute one and the same instrument. Debtor and each Guarantor acknowledge that Bank is relying upon the promise and representation by Debtor and each Guarantor that the Document signed and delivered to Bank has not been modified. All parties to the Documents intend that each Document produced by this process which contains Bank's original manual signature shall be for all purposes (including perfection of security interests and admissibility of evidence) the sole original authenticated Document. Bank will retain each original authenticated Document, which will be conclusively presumed to be identical to the version signed by Debtor and each Guarantor.

IN WITNESS WHEREOF, the parties hereto duly execute this Modification Agreement on OCTOBER 11, 2016.

| BMO HARRIS BANK N.A. | | DEBTOR: | 3FC INVESTMENTS, L.L.C. |
|---|---|---|---|
| BY | | BY | |
| NAME | JOEL DONNER | NAME | Scott Cooper |
| TITLE | AUTHORIZED SIGNER | TITLE | MANAGING MEMBER |
| ADDRESS | 1010 THOMAS EDISON BLVD SW. CEDAR RAPIDS, IA, 52404 | ADDRESS | P.O. BOX 3751 WEBB CITY, MO, JASPER, 64803 |

# GUARANTOR CONSENT

The undersigned Guarantor consents to the Modification Agreement and agrees that Guarantor's obligations and duties to Bank with regard to the Contract shall not be impaired or otherwise affected by execution of this Modification Agreement.

| GUARANTOR: | RONALD FREED | GUARANTOR: | SCOTT COOPER |
|---|---|---|---|
| BY | | BY | |
| TITLE | INDIVIDUAL | TITLE | INDIVIDUAL |
| GUARANTOR: | BRANDON FREED | GUARANTOR: | TONY FORSON |
| BY | | BY | |
| TITLE | INDIVIDUAL | TITLE | INDIVIDUAL |

# EXHIBIT C



# LOAN AND SECURITY AGREEMENT

The undersigned debtor, meaning all debtors jointly and severally ("Debtor"), to secure the obligations set forth herein grants to the Lender named below (with its successors and assigns, "Lender") under the terms and provisions of this agreement (this "Agreement") a security interest in the following property (with all present and future attachments, accessions, accessories, replacement parts, repairs and additions or substitutions, "Equipment"):

| Year | Manufacturer | Model | Description | Serial Number |
|------|-------------|-------|-------------|---------------|
| 2016 | PETERBILT | 579 | 579 | 1XPBDP9X3GD340296 |
| 2016 | PETERBILT | 579 | 579 | 1XPBDP9X5GD340297 |

## PAYMENT SCHEDULE

Debtor promises to pay Lender principal plus pre-computed interest and any administrative fee set forth below (the "Total Amount") of $345,294.18 in 66 installments as follows:

(a) $5,231.73 on AUGUST 1, 2015 and a like sum on the like date of each month thereafter until fully paid.

(b) In irregular installments as follows:

\# of Payments    Payment Amount    Payment Date

provided, however, that the final installment shall be in the amount of the then remaining unpaid balance plus any and all other accrued and unpaid sums due hereunder.

The interest under this Agreement is pre-computed. The Total Amount is calculated based on interest accruing at an interest rate of 6.25% per annum based on a 360-day year of twelve 30-day months, plus the administrative fee, if any, spread over the life of the loan. The total cost of credit includes such accrued interest and the administrative fee of $0.00 equating to an annual percentage rate of 6.25% based on a 360-day year of twelve 30-day months. Late payments may affect the actual total amount payable due to payment of delinquency charges and/or increased accrued interest. If the Payment Schedule contains (i) a period of longer than a month before the first Payment Date (the excess number of days herein referred to as a "Stub Period") or (ii) any month or months in which a Payment Amount is either not due or is in an amount less than the accrued interest for such month (in either event, such period herein referred to as a "Skip Period"), then at the option of Lender, to the extent permitted by law, the unpaid and accrued interest for such Stub Period or Skip Period may be added to the unpaid principal amount hereunder and shall thereafter accrue interest at the interest rate set forth above.

DELINQUENCY: FOR EACH INSTALLMENT NOT PAID WHEN DUE, DEBTOR AGREES TO PAY LENDER A DELINQUENCY CHARGE CALCULATED ON THE AMOUNT OF SUCH INSTALLMENT AT THE RATE OF 5% OF SUCH INSTALLMENT IF NOT PROHIBITED BY LAW, OTHERWISE AT THE HIGHEST RATE THAT DEBTOR CAN LEGALLY OBLIGATE ITSELF TO PAY AND/OR LENDER CAN LEGALLY COLLECT.

## USE OF PROCEEDS

Lender is hereby irrevocably authorized and directed to disburse the proceeds of this Agreement as follows:

| Amount | Payee (Name and Address) |
|--------|--------------------------|
| $291,514.00 | THE LARSON GROUP INC |
| | 4044 COYOTE DR |
| | JOPLIN, MO 64804 |

Disbursement may be made in Lender's name on Debtor's behalf or in Debtor's name. Disbursement in accordance with the above instructions or any written supplement to these instructions will constitute payment and delivery to and receipt by Debtor of all such proceeds.

PAYMENT ADDRESS: All amounts payable under this Agreement are payable at Lender's address shown below or at such other address as Lender may specify from time to time in writing. All written communication concerning disputed amounts, including any check or other payment instrument that (i) indicates that the written payment constitutes "payment in full" or is tendered as full satisfaction of a disputed amount or (ii) is tendered with other conditions or limitations (collectively a "Disputed Payment") must be mailed or delivered to us at the address for billing inquiries shown on the invoice or statement and not to the payment address.

## 1.0 THE EQUIPMENT

1.1 Disclaimer. LENDER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, AS TO THE QUALITY, WORKMANSHIP, DESIGN, MERCHANTABILITY, SUITABILITY, OR FITNESS OF THE EQUIPMENT FOR ANY PARTICULAR PURPOSE, OR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED. Debtor's obligations hereunder are absolute and unconditional notwithstanding the existence, location or condition of any item of Equipment or its suitability for use in Debtor's business.

1.2 Equipment Receipt and Use. Debtor warrants and agrees that: the proceeds of the loan and the Equipment will be used solely for business and commercial purposes; the Equipment is free from and will be kept free from all liens, claims, security interests and encumbrances other than that created hereby; Debtor will not, without Lender's prior written consent, sell, rent, lend, encumber, pledge, transfer, secrete or otherwise dispose of any of the Equipment, nor will Debtor permit any such act; the Equipment will be maintained in good operating condition, repair and appearance, and will be used and operated with care, only by qualified personnel in the regular course of Debtor's business; the Equipment shall remain personal property and not become part of any real property regardless of the manner of utilization; Lender may inspect the Equipment and all books and records relating to the Equipment or Debtor's performance under this Agreement at all reasonable times and from time to time; the Equipment will be kept at Debtor's place of business which is indicated immediately below Debtor's signature and will not be removed from said location without the prior written consent of Lender, except that an item of Equipment may be used away from said location in the regular course of Debtor's business provided that (a) such item is not removed from the United States (except for occasional use in Canada), and (b) if such item is not returned to said location within 30 days, Debtor will immediately upon Lender's request and each 30 days thereafter until the item is returned report the then current location thereof to Lender in writing.

1.3 Insurance. Debtor shall at all times bear all risk of loss of, damage to or destruction of the Equipment, and shall notify Lender if any of the Equipment is lost, damaged or destroyed. Debtor agrees to maintain insurance on the Equipment for the actual cash value thereof and for the life of this Agreement, covering all risks of physical loss or damage and such other risks as Lender may require, in form and amount and with insurers chosen by Debtor and satisfactory to Lender. Debtor agrees to deliver promptly to Lender certificates or, if requested, policies of insurance satisfactory to Lender, each with a standard long-form loss-payable endorsement naming Lender, its agent or such other party as Lender may from time to time instruct, and its successors and assigns, as loss-payee as their interests may appear. Each policy shall provide that Lender's interest therein will not be invalidated by the acts, omissions or neglect of anyone other than Lender, and shall provide that coverage may not be canceled or altered by the insurer except upon 30 days prior written notice to Lender. Lender's acceptance of policies in lesser

Page 1 of 5 of Loan and Security Agreement dated JUNE 30, 2015 between 3FC INVESTMENTS, L.L.C. (Debtor) and GE CAPITAL COMMERCIAL INC. (Lender).
821700 - Fund off fax - MO-PPP
1.12T 10/2014
Doc Request : ████████002
PRICINGENGINE 1271428

ORIGINAL FOR GE CAPITAL

DocuSign Envelope ID: ██████████████

amounts or risks will not be a waiver of Debtor's foregoing obligation. Debtor assigns to Lender all proceeds of any physical damage insurance maintained by Debtor with respect to the Equipment and any and all returned premiums, up to the amount owing hereunder by Debtor. Debtor directs all insurers to pay such proceeds directly to Lender and authorizes Lender to endorse Debtor's name to all remittances without the joinder of Debtor.

1.4     **Compliance With Law.** Debtor shall comply with all laws, rules and regulations applicable to Debtor and/or the operation of the Equipment, including without limitation, the USA PATRIOT Act and all laws, rules and regulations relating to import or export controls, anti-money laundering and terrorist financing.

## 2.0     SECURITY INTEREST

2.1     **Security Interest.** Debtor hereby grants to General Electric Capital Corporation, as agent for Lender and its Affiliates, and their respective successors and assigns, a first priority security interest in the Equipment to secure (a) payment of the Total Amount and all other obligations of Debtor to Lender under this Agreement, (b) the payment and performance of all other debts, liabilities and obligations of Debtor of every kind and character, whether now existing or hereafter arising, to Lender, whether under this Agreement or any other agreement, and (c) the payment and performance of all debts, liabilities and obligations of Debtor of every kind and character, whether now existing or hereafter arising, to each of Lender's Affiliates ("Liabilities"). For the purposes of this Agreement, an "Affiliate" of any party means and includes any direct or indirect parent, subsidiary or sister entity of that party and any successor or assign of any of them. Any sums at any time owing to Debtor and in the possession of Lender or any such Affiliate shall secure the Liabilities of Debtor to Lender and any Affiliate of Lender. Upon any assignment of this Agreement by Lender, the security interests granted herein will be assigned to and inure to the benefit of such assignee and the Affiliates of such assignee. The security interests granted herein shall continue to be effective regardless of any relating or redelivery of the Equipment to Debtor.

2.2     **Perfection and Preservation of Security Interest.** Debtor agrees, at its own cost and expense: to do everything necessary or desirable to perfect and preserve the security interests granted hereunder; to extinguish or defend any action, proceeding or claim affecting the Equipment; and to pay promptly any taxes, assessments, license fees and other public or private charges when levied or assessed against the Equipment or this Agreement. Debtor authorizes Lender or any officer, employee or designee of Lender to file a financing statement describing the Equipment for itself and as representative of its Affiliates. Debtor agrees to execute and deliver to Lender, upon Lender's request, such documents, records and assurances as Lender deems necessary or advisable to confirm or perfect the security interest in the Equipment and Lender's rights hereunder.

2.3     **Location of Debtor.** (i) If Debtor is a registered organization, its state of organization is in the state set forth immediately below its signature on the last page of this Agreement and Debtor agrees that it will not change its form or state of organization without 30 days prior written notice to Lender. (ii) If Debtor is an individual, his/her principal place of residence is at the address set forth immediately below his/her signature on the last page of this Agreement and, if Debtor changes Debtor's principal residence, Debtor will notify Lender in writing of a change in his/her principal place of residence within 30 days of such change. Debtor agrees to reimburse Lender for all costs incurred by Lender related to any such change.

## 3.0     ACCOUNT MANAGEMENT AND PAYMENT PROCESSING

3.1     **Application of Payments.** All payments made by Debtor to Lender pursuant to this Agreement may be applied by Lender, in its sole and absolute discretion, to delinquency charges, interest and other such charges due hereunder, to principal due hereunder, and to any other Liabilities due hereunder or under any other agreement, in any order and manner selected by Lender. Lender waives any right it may have to direct the application of any payments made by it to Lender, and Lender may at its option offset and deduct any liability or obligation of Debtor from any or all sums owed by it to Debtor.

3.2     **Debit Transactions.** Lender may but shall not be required to offer Debtor the option of paying any of Debtor's obligations to Lender through printed or electronic checks, drafts or charges ("Debit Transactions"). Each such Debit Transaction may be orally authorized by Debtor, any representative or officer of Debtor or any other party having access to or control of the account upon which the Debit Transaction is to be charged. Debtor authorizes Lender or any officer, employee or designee of Lender to initiate Debit Transactions from Debtor's account in the orally authorized amount plus Lender's then Debit Transaction Fee. This authorization may be canceled at any time by Debtor giving at least three business days' prior written notice to Debtor's bank and Lender. Debtor authorizes Lender to substitute a Debit Transaction for any check or other remittance submitted by Debtor in the amount of that remittance. Payment by Debit Transactions is not required by Lender nor is its use a factor in the approval of credit.

3.3     **Acceptable Forms of Payment/Payment Processing.** Credit to Debtor's account may be delayed if payment is (a) not received at the address indicated on the related invoice or (b) not accompanied by Debtor's invoice number. Preferred forms of payment include direct debit, wires, company checks and certified checks. Payment in any other form may delay processing or be returned to Debtor. Delayed credit may cause Debtor to incur a late payment fee. All credit for payments of Debtor's account is subject to final payment by the institution on which the item of payment was drawn. Debtor hereby agrees that any payment, other than a Disputed Payment, made by Debtor by remittance and received by Lender at an address other than the address specified on the related invoice may be replaced, at Lender's option, by Lender with a substitute written or electronic instrument of equal amount and presented to Debtor's financial institution for payment from the account referenced on the remittance from Debtor.

3.4     **Returned Payments.** If a check, draft or other remittance sent by Debtor or a Debit Transaction authorized by Debtor is returned unpaid or rejected for any reason other than the lack of a proper endorsement by Lender, the application of such payment to Debtor's Liabilities will be reversed and Debtor shall immediately pay Lender the amount of such returned payment, plus any delinquency charge accruing as the result of such reversal. Debtor shall further pay Lender any amount charged to Lender by any depository institution because of such return and an additional handling charge in the amount of $20, or if applicable law limits or restricts the amount of such reimbursement and/or handling charge, the amounts chargeable under this provision will be limited and/or restricted in accordance with applicable law.

3.5     **Authorization to Share Information.** Lender may receive from and disclose to any individual, corporation, business trust, association, company, partnership, joint venture, or other entity (collectively, the "Entity"), including, without limiting the generality of the foregoing, any Affiliate of Lender and any credit reporting agency or other entity whether or not related to Lender or any purpose, information about Debtor's accounts, credit application and credit experience with Lender and Debtor authorizes any Entity to release to Lender or any Affiliate of Lender any information related to Debtor's accounts, credit experience and account information regarding Debtor. This shall be continuing authorization for all present and future disclosures of Debtor's account information, credit application and credit experience on Debtor made by Lender, or any Entity requested to release such information to Lender.

3.6     **Maximum Interest Rate.** The parties hereto intend to comply with any applicable usury laws. Accordingly, they agree that, any provisions in this Agreement or any other agreement, document or communication to the contrary notwithstanding, this Agreement shall in no event require the payment or permit the collection of interest or any amount in the nature of interest or fees (collectively "Interest Amount") in excess of the maximum amount permitted by applicable law as now or hereafter construed by a court of competent jurisdiction. If any such excess Interest Amount is contracted for, charged or received pursuant to this Agreement, or if all of the principal balance under this Agreement shall be prepaid, or if the maturity of any amount under this Agreement is accelerated, so that under any of such circumstances or any other circumstance whatsoever the Interest Amount contracted for, charged or received shall exceed the maximum amount of interest permitted by applicable law as so construed, then in such event: (a) the Interest Amount hereunder shall be limited to the maximum amount lawfully permitted, and (b) any excess Interest Amount that may have been received shall, at Lender's option, either be credited to the unpaid principal balance of the loan as a prepayment of principal, without any prepayment fee, or refunded to Debtor, and the effective interest rate (taking into account all Interest Amounts) shall automatically be reduced to the maximum lawful rate allowed under applicable law as now or hereafter construed by a court of competent jurisdiction. Without limiting the foregoing, all calculations of the interest rate (taking into account all Interest Amounts) contracted for, charged or received with respect to this Agreement which are made for the purpose of determining whether such rate exceeds the maximum lawful rate, shall be made, to the fullest extent permitted by applicable law, by amortizing, prorating, allocating and spreading in equal parts during the period of the full stated term of the indebtedness, all Interest Amounts at any time contracted for, charged or received from or received from Debtor in connection with such indebtedness.

## 4.0     PERFORMANCE BY LENDER

4.1     **Performance.** If Debtor fails to perform any of its obligations hereunder, Lender may, but shall not be obligated to, perform the same for the account of Debtor to protect the interest of Lender or Debtor or both, at Lender's option. Debtor shall immediately repay to Lender any amounts paid by Lender together with

Page 2 of 5 of Loan and Security Agreement dated JUNE 30, 2015 between 3FC INVESTMENTS, L.L.C. (Debtor) and GE CAPITAL COMMERCIAL INC. (Lender).
621700 - Fund off fax - MO-PPP
1.12T  10/2014
Doc Request ██████ 0002
PRICINGENGINE 1271426                                                        ORIGINAL FOR GE CAPITAL

Case 3:21-cv-05056-DPR   Document 1   Filed 06/16/21   Page 25 of 45

interest thereon at the rate payable upon acceleration of Debtor's obligations under this Agreement. Performance by Lender will not constitute a waiver of any default by Debtor.

**4.2** **Power of Attorney.** DEBTOR HEREBY APPOINTS LENDER OR ANY OFFICER, EMPLOYEE OR DESIGNEE OF LENDER AS DEBTOR'S ATTORNEY-IN FACT TO, IN DEBTOR'S OR LENDER'S NAME: (a) PREPARE, EXECUTE AND SUBMIT ANY NOTICE OR PROOF OF LOSS IN ORDER TO REALIZE THE BENEFITS OF ANY INSURANCE POLICY INSURING THE EQUIPMENT; (b) PREPARE, EXECUTE AND FILE ANY AGREEMENT, DOCUMENT, FINANCING STATEMENT, TITLE APPLICATION, INSTRUMENT (OR ANY OTHER WRITING OR RECORD) THAT, IN LENDER'S OPINION, IS NECESSARY TO PERFECT AND/OR GIVE PUBLIC NOTICE OF THE INTERESTS OR LENDER IN ANY EQUIPMENT; AND (c) ENDORSE DEBTOR'S NAME ON ANY REMITTANCE REPRESENTING PROCEEDS OF ANY INSURANCE RELATING TO THE EQUIPMENT OR THE PROCEEDS OF THE SALE, LEASE OR OTHER DISPOSITION OF THE EQUIPMENT (WHETHER OR NOT THE SAME IS A DEFAULT HEREUNDER). This power is coupled with an interest and is irrevocable as long as any Liabilities remain unpaid.

**5.0** **DEFAULT AND REMEDIES**

**5.1** **Events of Default.** Time is of the essence. An event of default shall occur if: (a) Debtor fails to pay when due any amount owed by it to Lender or any Affiliate of Lender under this Agreement; (b) Debtor or a Guarantor fails to pay any Liabilities when due to Lender or any Affiliate of Lender or is otherwise in default under any other document, agreement or instrument; (c) Debtor or a Guarantor defaults under the terms of any secured indebtedness or indebtedness of a material amount to any other party; (d) Debtor or a Guarantor fails to perform or observe any other term or provision to be performed or observed by it hereunder or under any other instrument or agreement furnished by Debtor or a Guarantor to, or otherwise acquired by, Lender or any Affiliate of Lender; (e) (i) Debtor or a Guarantor becomes insolvent, ceases to do business as a going concern, makes an assignment for the benefit of creditors, or takes advantage of any law for the relief of debtors, or (ii) a petition in bankruptcy or for an arrangement, reorganization, or similar relief is filed by or against Debtor or a Guarantor, or (iii) any property of Debtor or a Guarantor is attached, or a trustee or receiver is appointed for Debtor or a Guarantor or for substantial part of its property, or Debtor or a Guarantor applies for such appointment. (f) any of the Equipment is lost or destroyed; (g) there shall occur an appropriation, confiscation, retention, or seizure of control, custody or possession of any Equipment by any governmental authority, governmental agency or instrumentality (such entities, agencies and instrumentalities, collectively, "Governmental Authority"); (h) Debtor or anyone in the control, custody or possession of any Equipment is accused, alleged or charged by any Governmental Authority to have used any Equipment in connection with the commission or any crime (other than a misdemeanor moving violation); (i) there shall be a material adverse change in any of the (A) condition (financial or otherwise), business, performance, prospects, operations or properties of Debtor or a Guarantor, (B) legality, validity or enforceability of this Agreement (C) perfection or priority of the lien granted in favor of Lender pursuant to this Agreement, or (D) ability of the Debtor to repay the Indebtedness or perform its obligations under this Agreement; (j) rights and remedies of Lender under this Agreement are impaired; (k) there shall be a death of majority owner of Debtor or a Guarantor, or there shall be a death of the Debtor or a Guarantor, if an individual; or (l) there shall be any lien, claim or encumbrance on any of the Equipment except in favor of Lender or as otherwise granted herein.

**5.2** **Remedies.** Upon the occurrence of an event of default, and at any time thereafter as long as the default continues, Lender may, at its option, with or without notice to Debtor (i) declare this Agreement to be in default, (ii) declare the Indebtedness hereunder to be immediately due and payable, (iii) declare all other debts then owing by Debtor to Lender to be immediately due and payable, and (iv) exercise all of the rights and remedies of a secured party under the Uniform Commercial Code and any other applicable laws, including the right to require Debtor to assemble the Equipment and deliver it to Lender at a place to be designated by Lender and to enter any premises where the Equipment may be without judicial process and take possession thereof. Any property other than Equipment that is in or upon the Equipment at the time of repossession may be taken and held without liability. Any requirement that Lender give reasonable notice regarding the sale or other disposition of Equipment will be met if such notice is mailed to Debtor at its last known address at least ten days before any such sale or other disposition. Lender may dispose of any Equipment at a public or private sale or at auction. Lender may buy at any sale and become the owner of the Equipment. Debtor agrees that Lender may bring legal proceedings to enforce the payment and performance of Debtor's obligations hereunder in any court in the State shown in Lender's address set forth herein, and service of process may be made upon Debtor by mailing a copy of the summons to Debtor at its address shown herein. Debtor shall also pay to Lender all expenses of retaking, holding, preparing for sale, selling and the like, including without limitation (a) the reasonable fees of any attorneys retained by Lender, and (b) all other legal expenses incurred by Lender. Debtor agrees that Debtor is liable for any deficiency remaining after any disposition of Equipment after default. Lender may sell the Equipment without giving any warranties as to the Equipment. Lender may disclaim any warranties of title, possession, quiet enjoyment, or the like. This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Equipment.

**5.3** **Acceleration Interest.** Debtor agrees to pay Lender, upon acceleration of the above indebtedness, interest on all sums then owing hereunder at the rate of 1 1/2% per month if not prohibited by law, otherwise at the highest rate Debtor can legally obligate itself to pay or Lender can legally collect under applicable law.

**6.0** **PREPAYMENT**

**6.1** **Partial Prepayment and Reschedule.** (a) Debtor does not have the right to prepay only a portion of the balance of this Agreement prior to maturity. (b) If there are several units subject to this Agreement and Lender either (i) requires (as a result of a casualty loss) or (ii) permits all indebtedness that relates to a specific unit to be paid in full, Lender will apply the proceeds identified as relating thereto to the balance due under this Agreement and reschedule the remaining indebtedness under this Agreement over the then remaining term in accordance with the provisions set forth below. If Lender receives one or more remittance(s) in an aggregate amount in excess of the amounts then due and unpaid under this Agreement (other than any amounts paid pursuant to 6.1(b) above) ("Excess Remittances") Lender may, at its option: (i) apply any portion of such Excess Remittances (A) in payment of obligations then due or past due under any other agreement Debtor has with Lender, (B) to the balance due under this Agreement in any manner selected by Lender, with or without rescheduling the remaining indebtedness over the then remaining term; or (ii) return such excess amount to Debtor at its last known address. (d) The interest included in this Agreement is precomputed and accrues in arrears; accordingly, early payment of one or more installments prior to their maturity date may not reduce the total interest payable by Debtor under this Agreement unless Lender reschedules the remaining payments. If Lender reschedules the indebtedness under this Agreement, Lender will deduct the unaccrued portion of interest on the unpaid balance under this Agreement at the time of reschedule (which the parties agree shall be deemed to have been made and shall be effective as of the next scheduled due date (the "Effective Reschedule Date") calculated using any method selected by Lender as permitted by applicable law, and recalculate precomputed interest on such unpaid balance as of the Effective Reschedule Date. Debtor will not receive any rebate of, or credit for, interest relating to any period prior to the Effective Reschedule Date. (e) If Lender permits Debtor to make a partial prepayment pursuant to clause (b)(ii) of this Section, Debtor agrees that it will at the time of such prepayment pay a prepayment fee equal to the pro rata portion of the prepayment fee that would have been paid pursuant to Section 6.2 below if Debtor had prepaid the indebtedness under this Agreement in full, computed based on the percentage of the outstanding Total Amount being prepaid (for purposes of calculating the outstanding Total Amount, no effect shall be given to any prior prepayments).

**6.2** **Prepayment in Full.** Subject to the terms of this provision, Debtor may prepay the indebtedness under this Agreement in full (but not in part) at any time, so long as Debtor is not in default hereunder; provided, however, that any prepayment that is not paid on a scheduled payment due date shall be deemed to have been made and shall be effective as of the next scheduled due date (the "Effective Prepayment Date"). If the prepayment is made prior to the last twelve months of the contract (as originally scheduled or if extended, as extended), Debtor shall pay a prepayment fee equal to the lesser of (a) $15.00, and (b) the maximum prepayment and/or acquisition charge allowed by applicable law. Debtor and Lender acknowledge and agree that the prepayment fee is a reasonable estimate of the actual or anticipated harm sustained by Lender for Debtor's prepayment of the Total Amount. For purposes of calculating the prepayment amount and any prepayment fee, any unearned interest that would accrue after the Effective Prepayment Date shall be excluded from the calculation of the Total Amount outstanding as of the Effective Prepayment Date. Debtor will not receive any rebate of, or credit for, interest relating to any period prior to the Effective Prepayment Date. Debtor agrees that all accrued and unpaid late charges and other amounts due from Debtor under this Agreement will be paid concurrently with any such prepayment.

**7.0** **ASSIGNMENT AND GENERAL PROVISIONS**

**7.1** **Chattel Paper.** The only copy of this Agreement that constitutes "Chattel Paper" for all purposes of the Uniform Commercial Code is the copy marked "ORIGINAL FOR GE CAPITAL" which is delivered to and held by GE Capital.

Page 3 of 5 of Loan and Security Agreement dated JUNE 30, 2015 between 3FC INVESTMENTS, L.L.C. (Debtor) and GE CAPITAL COMMERCIAL INC. (Lender)
621700 - Fund off fax - MO-PPP
1.12T 10/2014
Doc Request: ███████0002
PRICINGENGINE 1271426                                    ORIGINAL FOR GE CAPITAL

**7.2      Assignment and Waiver.** This Agreement may not be assigned by Debtor without the prior written consent of Lender. Lender may sell, transfer or assign any or all rights under this Agreement or sell participations herein without notice to, acknowledgment of, or consent from Debtor. Debtor hereby (a) consents to such assignment or participation and agrees not to assert against Lender or any such assignee or participant any claims, counterclaims, claims in recoupment, abatement, reduction, defenses, or set-offs for breach of warranty or for any other reason which Debtor could assert against Lender, any such assignee or participant or the manufacturer of the Equipment, except defenses which cannot be waived under the Uniform Commercial Code; and (b) agrees to make and/or settle any and all claims with regard to the Equipment directly and exclusively against and with the manufacturer. Debtor agrees that no assignee or participant will have any obligations or liabilities under this Agreement to Debtor or to any other person by reason of any assignment or participation. Debtor hereby waives any right of set-off Debtor may now or hereafter have against Lender or any assignee of or participant in this Agreement. Upon Lender's assignment of Lender's entire interest in this Agreement, Lender shall be relieved, from and after the date of such assignment, of any liability for the performance of any obligation of Lender contained in this Agreement or any document executed in conjunction with this Agreement.

**7.3      General.** (a) Waiver of any default shall not be a waiver of any other default. (b) All of Lender's rights are cumulative and not alternative. (c) No waiver or change in this Agreement shall bind Lender unless in writing signed by one of its authorized representatives. (d) Any provision hereof contrary to, prohibited by or invalid under applicable laws or regulations shall be inapplicable and deemed omitted herefrom, but shall not invalidate the remaining provisions hereof. (e) Debtor authorizes Lender to correct patent errors herein and to make changes to this Agreement or to any related schedule that benefit Debtor. In addition, if the funding amount Debtor requests Lender to disburse exceeds the principal portion of the Total Amount due to changes in calculation of taxes, configuration of the Equipment or other factors affecting the cost of the Equipment, and if such an increase is within the limits of Lender's credit approval, Debtor authorizes Lender, upon written notice to Debtor, to increase the principal portion of the Total Amount by not more than fifteen percent and adjust the Total Amount and the installment amounts payable under this Agreement or any related schedule accordingly. (f) Any captions to the provisions of this Agreement are for convenience only and do not limit or affect the application or interpretation of this Agreement. (g) All of the terms and provisions of this Agreement shall apply to and be binding upon Debtor and its heirs, personal representatives, successors and assigns and shall inure to the benefit of Lender and its successors and assigns. (h) The acceptance by Lender of any remittance from a party other than Debtor shall in no way constitute Lender's consent to the transfer of any of the Equipment to such party. (i) Debtor represents and warrants that there is no material pending or threatened investigation by any governmental authority, litigation or other legal proceeding against or involving Debtor. (j) So long as any of the Liabilities remains unpaid or unperformed, Debtor will provide Lender with such financial information as Lender may reasonably request, including copies of Debtor's financial statements within 30 days of the end of each of Debtor's fiscal quarters and within 90 days after the end of each of Debtor's fiscal years. Such financial statements shall be prepared in accordance with GAAP and on the same basis (reviewed, audited, etc.) as Debtor's financial statements are currently prepared unless advised by Lender otherwise, at which time Debtor will comply with Lender's request. Debtor represents and warrants that all financial statements delivered will present fairly the financial condition and results of operations and cash flows of the Debtor as of the dates thereof and for the periods then ended. (k) Lender may pay fees to or receive fees from the seller or manufacturer of the Equipment, a broker, or other third party in connection with this Agreement. Such fees may affect the rate, terms and Debtor's total cost hereunder. (l) Debtor hereby agrees to indemnify, defend and hold harmless Lender and its Affiliates and respective principals, directors, employees, representatives, agents and third-party advisors from and against any and all losses, disputes, claims, expenses (including, without limitation, legal expenses), damages and liabilities of whatsoever kind and nature arising out of, in connection with, or relating to the Equipment, this Agreement or any other document related hereto. If allowed by law, the legal expenses shall include the amount of any flat fee, retainer, contingent fee or the hourly charges of any attorney retained by Lender in enforcing any of Lender's rights hereunder or in the prosecution or defense of any litigation related to this Agreement or the transactions contemplated by this Agreement. This indemnification shall survive the termination or expiration of this Agreement.

**7.4      Additional Covenants and Oral Agreement.** THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**7.5      Waiver of Trial By Jury.** LENDER AND DEBTOR HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION RELATING TO THIS AGREEMENT. LENDER AND DEBTOR HEREBY, FOR THEMSELVES, THEIR SUCCESSORS AND ASSIGNS, WAIVE ANY RIGHT TO SUE FOR OR COLLECT FROM THE OTHER PARTY ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OF ANY CHARACTER AS A RESULT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR THE ENFORCEMENT BY EITHER PARTY OF ITS RIGHTS UNDER THIS AGREEMENT EXCEPT TO THE EXTENT THAT ANY SUCH DAMAGES ARE PROVEN TO BE THE DIRECT RESULT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE OTHER PARTY.

**7.6      Governing Law/Choice of Venue.** Anything in this Agreement to the contrary notwithstanding, the transactions contemplated by this Agreement shall be deemed approved and entered into within the State of Utah and all credit or other financial accommodations extended by Lender under this Agreement shall be deemed extended from and subject to the laws of the State of Utah (without regard to the conflicts of law principles of such State) regardless of the location of Debtor or any of the Equipment. Any legal action or proceeding with respect to this Agreement or the transactions contemplated by this Agreement shall be brought exclusively in the federal or state courts located in the State of Utah, and Debtor accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts; provided, however, that nothing in this Agreement shall limit or restrict the right of Lender to commence any proceeding in the federal or state courts located in the state in which the Equipment is located to the extent Lender deems such proceeding necessary or advisable to exercise remedies available under this Agreement or to commence legal proceedings or otherwise proceed against Debtor in any other jurisdiction. Lender and Debtor hereby irrevocably waive any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens, that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions.

**7.7      Execution and Transmission of Documentation.** This Agreement and any schedules, exhibits, annexes or related instruments (each an "Instrument") will be created and evidenced as follows: (i) we, Lender, will deliver to you, Debtor, an electronic or paper version of each Instrument; (ii) you will print and sign (and initial where indicated), using either ink on paper (a "manual" signature) or, if instructed or expressly permitted by us in writing, by electronic or digital means (an "electronic" signature), the signature page of each such Instrument and deliver the same to us by electronic, facsimile or other means; (iii) we will sign (electronically, digitally or manually, at our option) each signature page so delivered by you (if the Instrument requires our signature); and (iv) we will attach each fully signed signature page to an electronic or printed paper copy of the applicable Instrument. You hereby represent and warrant that you have not modified the Instrument sent to you for signature. Upon your one-time request for a copy of any fully signed Instrument promptly after it has been produced by this process, we will make the same available to you by electronic or other means. Each Instrument produced by this process will be conclusively presumed to be identical to the version signed or initialed by you, and we may (at our option) retain only a copy of such Instrument and dispose of the version containing your manual signature. We both intend that each Instrument produced by this process shall be for all purposes (including perfection of security interests and admissibility of evidence) the sole original authenticated Instrument, and to the extent, if any, that any Instrument constitutes chattel paper (as the term is defined in the applicable Uniform Commercial Code), no security interest in such Instrument may be created through the transfer or possession of any counterpart or copy thereof, other than the Instrument produced by this process. You agree not to raise as a defense to the enforcement of any Instrument that you executed such Instrument by electronic or digital means or used facsimile or other electronic means to transmit your signature on such Instrument. Notwithstanding anything to the contrary herein, we reserve the right to require you to sign any Instrument manually and to deliver to us an original of such Instrument containing your manual signature.

Page 4 of 5 of Loan and Security Agreement dated JUNE 30, 2015 between 3FC INVESTMENTS, L.L.C. (Debtor) and GE CAPITAL COMMERCIAL INC. (Lender)
621700 - Fund off fax - MO-PPP
1.12T  10/2014
Doc Request : ▮▮▮▮0002
PRICINGENGINE 1271426                                        ORIGINAL FOR GE CAPITAL

DocuSign Envelope ID:

## IMPORTANT INFORMATION ABOUT ESTABLISHING A RELATIONSHIP WITH GE CAPITAL

To help the United States Government fight terrorism and money laundering, Federal law requires us to obtain, verify, and record information that identifies each person or business that opens an account or establishes a relationship. What this means for you: when you open an account or establish a relationship, we will ask for your name, street address, date of birth, and identification number, such as a social security number or taxpayer identification number. For businesses, we will ask for the business name, street address and tax identification number. Federal law requires us to obtain this information. We may also ask to see your driver's license or other identifying documents that will allow us to identify you. We appreciate your cooperation.

## DELIVERY AND ACCEPTANCE OF EQUIPMENT
(Check Appropriate Box)

Debtor's obligations and liabilities to Lender are absolute and unconditional under all circumstances and regardless of any failure of operation or Debtor's loss of possession of any item of Equipment or the cessation or interruption of Debtor's business for any reason whatsoever.

☒ On **JUNE 30, 2015**, the Equipment being purchased with the proceeds of this Agreement was delivered to Debtor with all installation and other work necessary for the proper use of the Equipment completed at a location agreed upon by Debtor; the Equipment was inspected by Debtor and found to be in satisfactory condition in all respects and delivery was unconditionally accepted by Debtor.

☐ The Equipment being purchased with the proceeds of this Agreement has not yet been delivered to or accepted by Debtor and, upon delivery, Debtor agrees to execute such delivery and acceptance certificate as Secured Party requires.

☐ All of the Equipment was acquired by Debtor prior to the date hereof and was previously delivered to and unconditionally accepted by Debtor.

Dated: __JUNE 30, 2015__                     Debtor(s) hereby acknowledge(s) receipt of an exact copy of this contract.

Lender:   GE CAPITAL COMMERCIAL INC.              Debtor:   **3FC INVESTMENTS, L.L.C.**

          *Shana Gray*

By:       37F37810A0D7429                          By:

Name:     Shana Gray                               Name:    **BRANDON FREED**

Title:    AUTHORIZED SIGNER                        Title:    **MANAGING MEMBER**

          300 E. JOHN CARPENTER FREEWAY            State of Organization:   **MO**
          *Street Address*

          IRVING, TEXAS 75062-2712
          *(City, State and Zip Code)*

                                                   Principal Residence/Chief Executive Office/Place of Business:
                                                   **615 SOUTH ELLIOTT ST**
                                                   *(Street Address)*
                                                   **WEBB CITY, MO 64870**
                                                   *(City, State and Zip Code)*

                                                   Billing/Invoice Address:

                                                   _____
                                                   *(Address)*

                                                   _____
                                                   *(City, County, State and Zip Code)*

                                                   When not in use, the Equipment will be kept at:

                                                   **615 SOUTH ELLIOTT ST**
                                                   *(Equipment Street)*
                                                   **WEBB CITY, JASPER, MO 64870**
                                                   *(Equipment City, County, State, and Zip)*

Page 5 of 5 of Loan and Security Agreement dated JUNE 30, 2015 between 3FC INVESTMENTS, L.L.C. (Debtor) and GE CAPITAL COMMERCIAL INC. (Lender).
621700 - Fund off fax - MO-PPP
1.12T 10/2014
Doc Request:        002
PRICINGENGINE 1271426                               ORIGINAL FOR GE CAPITAL

# EXHIBIT D

**BMO Harris Bank N.A.**

JOEL DONNER
ACCOUNT MODIFICATION SPECIALIST
1010 THOMAS EDISON BLVD SW
CEDAR RAPIDS, IA 52404, USA
Tel: 319-841-7722
Fax: 866-441-0068
JOEL.DONNER@BMOTF.COM

3FC INVESTMENTS, LLC
P.O. BOX 3751
JOPLIN, MO 64803
RE: ▨▨▨▨▨0002

OCTOBER 11, 2016

Dear Sir/Madam:

Please find enclosed Reschedule Agreement document(s) regarding the above-mentioned account(s). Your new payment schedule is outlined in the agreement. The Reschedule Charge is the interest that is being charged due to the reschedule.

Please sign and return the modification agreement along with a copy of this letter to me at:

Email – Joel.Donner@BMOTF.com
Fax – 866-441-0068

We must receive these documents by **OCTOBER 18, 2016** to process your reschedule promptly.

Sincerely,

JOEL DONNER
ACCOUNT MODIFICATION SPECIALIST

# MODIFICATION AGREEMENT
## (Precomputed – 2 Party)

This Modification Agreement (this "Modification Agreement") is made by and between 3FC INVESTMENTS, LLC ("Debtor") and BMO HARRIS BANK N.A. (together with its successors and assigns, "Bank") and any guarantor, co-debtor or endorser signing below.

WHEREAS, Debtor entered into that certain security agreement dated **JUNE 30, 2016** (herein with all amendments, attachments, riders, modifications and any accompanying notes, referred to as the "Contract") which was executed by Debtor as evidence of and security for the payment of the amounts set forth therein;

WHEREAS, Bank is either the original secured party under the Contract, together with any related guaranties and other related instruments and documents, or all such agreements have been assigned to and are now owned by Bank;

WHEREAS, Debtor has requested that Bank modify the terms of the Contract, and Bank will agree to reschedule the balance of the Contract only if the terms and conditions of this Modification Agreement are fully complied with; and

WHEREAS, the parties agree that this Modification Agreement shall be made a part of and specifically incorporated into the Contract.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follow:

| | | | |
|---|---|---|---|
| 1. | (a) Unpaid Balance of Contract (Principal and Finance Charges) | $277,282.06 | |
| | (b) Deduct: Finance Charge Refund | $39,498.87 | |
| | (c) Total of (a) minus (b) | | $237,783.19 |
| | (d) Add: | | |
| | (i) Official fees | $0.00 | |
| | (ii) Other | $0.00 | |
| | (iii) Total additions | | $0.00 |
| | (e) Rescheduled Principal Balance: Total of (c) plus (d) | | $237,783.19 |
| | (f) Rescheduled Finance Charges | | $37,086.21 |
| | (g) Rescheduled Balance of Contract: (e) plus (f) | | $274,869.40 |
| | (h) Rescheduling Fee | | $0.00 |
| | (i) Accrued but unpaid delinquency and collections charges | | $784.77 |

2. Debtor promises and agrees to pay to Bank the Reschedule Balance of Contract (Item 1(g) above) of $274,869.40 in 54 installments as follow:

*For equal successive monthly installments*

$0.00 on _____
(Date)

and a like sum on the like date of each month thereafter until fully paid, provided, however, that the final installment shall be in the amount of the remaining unpaid balance.

| *For other than successive monthly installments* | Payment Amount | No. of Payments | Payment Date |
|---|---|---|---|
| | $0.00 | 2 | 10/01/2016 |
| | $5,285.95 | 52 | 12/01/2016 |

The Rescheduled Finance Charges (Item 1(f) above) under this Modification Agreement are precomputed and calculated based on an interest rate of 6.25% per annum, exclusive of any fees, costs or the Rescheduling Fee, if any (Item 1(h) above). The calculation of interest and is calculated using a 360-day year of twelve 30-day months, unless otherwise provided in the Contract. Late payments may affect the total payments due as a result of increased late charges.

3. Debtor promises to pay Bank the accrued but unpaid delinquency and collection charges (item 1(i) above) and the Rescheduling Fee (item 1(h above) as follows:

| | |
|---|---|
| Upon execution of Modification Agreement | The amount of $0.00 upon execution of this Modification Agreement. |
| On or before final payment | The amount of $784.77 on or before the due date of the final payment under the Contract, as herein modified. |

| By an agreed upon Schedule | Payment Amount | No. of Payments | Payment Date |
|---|---|---|---|

Delinquency and collection charges accrued after the execution of the Modification Agreement shall be paid in accordance with the terms and conditions of the Contract

4. All payments should be made to the following address (the "Payment Address"): PO BOX 71951, CHICAGO, IL, 60694-1951.

5. This Modification Agreement is not a novation of the Contract. Except as specifically modified hereby, the terms and provisions of the Contract shall remain in full force and effect. No oral agreement, guaranty, promise, representation or warranty shall be binding on Bank. If any portion or provision of this Modification Agreement is deemed unenforceable in any respect, then and in such case, the parties agree that such portion or provision shall be inapplicable and deemed omitted herefrom, but shall not invalidate the remaining provisions of this Modification Agreement or the Contract.

6. Debtor acknowledges and agrees that any security interest previously granted under the Contract in and to the Collateral described therein shall continue to secure the amounts owing under the Contract, as modified hereby. Nothing in this Modification Agreement shall waive any late fees that are due and owing by the Debtor at the time of this Modification Agreement.

7. **Reaffirmation of Contract.** DEBTOR HEREBY REAFFIRMS ALL PAYMENT AND PERFORMANCE OBLIGATIONS TO BANK CONTAINED IN THE CONTRACT AS AMENDED AND ANY AND ALL CREDIT SUPPORT DOCUMENTS, AND ALL TERMS, COVENANTS AND CONDITIONS THEREOF. DEBTOR ACKNOWLEDGES AND REPRESENTS THAT DEBTOR HAS NO VALID DEFENSE, SETOFF, RECOUPMENT, ABATEMENT, OR COUNTER CLAIM TO THE PAYMENT OF ANY SUMS DUE, OR TO PERFORMANCE OF ANY OBLIGATIONS, UNDER THE CONTRACT AND CREDIT SUPPORT DOCUMENTS, OR ANY OF THEM, NOR DOES DEBTOR HAVE ANY VALID CLAIMS AGAINST BANK OR ITS PREDECESSORS-IN-INTEREST OR ASSIGNORS, OR LEGAL OR EQUITABLE RIGHTS IN REGARD TO ENFORCEMENT OF THE OBLIGATIONS OF DEBTOR BY BANK UNDER THE CONTRACT AND CREDIT SUPPORT DOCUMENTS, OR ANY OF THEM, AND DEBTOR SPECIFICALLY WAIVES AND RELINQUISHES ANY SUCH RIGHTS OR CLAIMS.

8. Credit to Debtor's account(s) may be delayed if payment is (a) not received at the Payment Address or (b) not accompanied by Debtor's invoice number. Preferred forms of payment include Direct Debit, Wires, Company Checks and Certified Checks. Payment in any other form may delay processing or be returned to Debtor. Delayed credit may cause Debtor to incur a late payment fee. All credit for payments of Debtor's account(s) are subject to final payment by the institution on which the item of payment was drawn. All written communication concerning disputed amounts, including any check or other payment instrument that (i) indicates that the written payment constitutes "payment in full" or is tendered as full satisfaction of a disputed amount or (ii) is tendered with other conditions or limitation ("Disputed Payments") must be mailed or delivered to Bank at the address for billing inquiries shown on the invoice or statement and not to the Payment Address.

9. Bank's agreement to the aforesaid rescheduling is expressly made subject to and conditioned upon all Guarantors of Debtor's obligations under the Contract executing one or more counterparts of this Modification Agreement in the space provided to evidence their consent and agreement as set forth below. This Modification Agreement will not become effective unless and until accepted and signed by Bank. This Modification Agreement shall be binding upon and inure to the benefit of all the parties hereto and their respective administrators, successors and permitted assigns. Each of the parties executing this Modification Agreement acknowledges receipt of a copy hereof.

10. This Modification Agreement will be created and evidenced as follows: (i) Bank will deliver to Debtor and each Guarantor an electronic or paper version of each document to be signed by the parties, including any schedules, exhibits or related documents (each, a "Document"); (ii) Debtor and each Guarantor will print and manually sign the signature page of each Document and deliver to Bank by facsimile, scan or other means the signed Document; (iii) Bank will manually sign each signature page of each Document received from Debtor and each Guarantor; and (iv) Bank will attach each fully signed signature page to a printed paper copy of the applicable Document. By signing and transmitting a Document to Bank, Debtor and each Guarantor confirm their intent to sign such Document and accept its terms. If the Debtor and each

Guarantor sign different counterparts of the signature page, all of such counterparts along with the signature page signed by Bank together constitute one and the same instrument. Debtor and each Guarantor acknowledge that Bank is relying upon the promise and representation by Debtor and each Guarantor that the Document signed and delivered to Bank has not been modified. All parties to the Documents intend that each Document produced by this process which contains Bank's original manual signature shall be for all purposes (including perfection of security interests and admissibility of evidence) the sole original authenticated Document. Bank will retain each original authenticated Document, which will be conclusively presumed to be identical to the version signed by Debtor and each Guarantor.

IN WITNESS WHEREOF, the parties hereto duly execute this Modification Agreement on OCTOBER 11, 2016.

| BMO HARRIS BANK N.A. | | DEBTOR | 3FC INVESTMENTS, L.L.C. |
|---|---|---|---|
| BY | | BY | |
| NAME | JOEL DONNER | NAME | Scott Cooper |
| TITLE | AUTHORIZED SIGNER | TITLE | MANAGING MEMBER |
| ADDRESS | 1010 THOMAS EDISON BLVD SW, CEDAR RAPIDS, IA, 52404 | ADDRESS | P.O. BOX 3751 WEBB CITY, MO, JASPER 64803 |

# GUARANTOR CONSENT

The undersigned Guarantor consents to the Modification Agreement and agrees that Guarantor's obligations and duties to Bank with regard to the Contract shall not be impaired or otherwise affected by execution of this Modification Agreement.

| GUARANTOR: | RONALD FREED | GUARANTOR: | SCOTT COOPER |
|---|---|---|---|
| BY | | BY | |
| TITLE | INDIVIDUAL | TITLE | INDIVIDUAL |

| GUARANTOR: | BRANDON FREED | GUARANTOR: | TONY FORSON |
|---|---|---|---|
| BY | | BY | |
| TITLE | INDIVIDUAL | TITLE | INDIVIDUAL |

# EXHIBIT E

# CONTINUING GUARANTY

For Valuable Consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned, for themselves, their heirs, executors, personal representatives, successors and assigns (individually called "Guarantor" and collectively called "Guarantors") jointly and severally and in solido, hereby unconditionally guarantee to GENERAL ELECTRIC CAPITAL CORPORATION, GE CAPITAL COMMERCIAL INC., GE TF TRUST and GE CF TRUST and their respective affiliates, together with the respective successors, endorsees and assigns of each of the foregoing (collectively called "GE Capital") and 3FC INVESTMENTS, L.L.C. (the Company), whose address is 615 SOUTH ELLIOTT ST, WEBB CITY, MO 64870 shall promptly and fully perform, pay and discharge all of its present and future liabilities, obligations and indebtedness to GE Capital, whether direct or indirect, joint or several, absolute or contingent, secured or unsecured, matured or un-matured, and whether originally contracted with or otherwise acquired by GE Capital (all of which liabilities, obligations and indebtedness are herein individually and collectively called the "Indebtedness"). This Guaranty is an absolute and unconditional guarantee of payment and not of collectability. The liability of each Guarantor hereunder is not conditional or contingent upon the genuineness, validity, sufficiency or enforceability of the Indebtedness or any instruments, agreements or chattel paper related thereto (collectively called "Agreements") or any security or collateral there for (collectively called "Security") or the pursuit by GE Capital of any rights or remedies which it now has or may hereafter have. If the Company fails to pay the Indebtedness promptly as the same becomes due, or otherwise fails to perform any obligation under any of the Agreements, each Guarantor agrees to pay on demand the entire Indebtedness and all losses, costs, attorneys' fees and expenses which may be suffered by GE Capital by reason of the Company's default or the default of any Guarantor hereunder, and agrees to be bound by and to pay on demand any deficiency established by the sale of any of the Agreements or Security, all without relief from valuation and appraisement laws and without requiring GE Capital to (i) proceed against the Company by suit or otherwise, (ii) foreclose, proceed against, liquidate or exhaust any of the Agreements or Security, or (iii) exercise, pursue or enforce any right or remedy GE Capital may have against the Company, any co-Guarantor (whether hereunder or under a separate instrument) or any other party. Each Guarantor agrees that this Guaranty shall not be discharged or affected by any circumstances which constitute a legal or equitable discharge of a Guarantor or surety, or by the death of any Guarantor, the records of GE Capital shall be received as conclusive evidence of the amount of the Indebtedness at any time owing; one or more successive or concurrent suits may be brought and maintained against any or all of the Guarantors, at the option of GE Capital, with or without joinder of the Company or any of the other Guarantors as parties thereto; such Guarantor will not avail itself of any defense whatsoever which the Company may have against GE Capital, other than full payment of the Indebtedness, and such Guarantor will not seek a change of venue from any jurisdiction or court in which any action, proceeding or litigation is commenced.

Each Guarantor agrees to provide promptly to GE Capital such financial statements and other financial records and information respecting Guarantor as GE Capital may from time to time request. Each Guarantor authorizes GE Capital, throughout the term of this Guaranty, to investigate or make inquiries of creditors or any other persons and credit bureaus regarding Guarantor (including equity holders of Guarantor), and provide to creditors or any other persons any financial, credit or other information regarding or relating to Guarantor, whether supplied by Guarantor to GE Capital or otherwise obtained by GE Capital.

EACH GUARANTOR HEREBY WAIVES NOTICE OF ANY ADVERSE CHANGE IN THE COMPANY'S CONDITION OR OF ANY OTHER FACT WHICH MIGHT MATERIALLY INCREASE SUCH GUARANTOR'S RISK, WHETHER OR NOT GE CAPITAL HAS KNOWLEDGE OF THE SAME. EACH GUARANTOR ALSO HEREBY WAIVES ANY CLAIM, RIGHT OR REMEDY WHICH SUCH GUARANTOR MAY NOW HAVE OR HEREAFTER ACQUIRE AGAINST THE COMPANY THAT ARISES HEREUNDER AND/OR FROM THE PERFORMANCE BY ANY GUARANTOR HEREUNDER INCLUDING, WITHOUT LIMITATION, ANY CLAIM, REMEDY OR RIGHT OF SUBROGATION, REIMBURSEMENT, EXONERATION, CONTRIBUTION, INDEMNIFICATION, OR PARTICIPATION IN ANY CLAIM, RIGHT OR REMEDY OF GE CAPITAL AGAINST THE COMPANY OR ANY SECURITY WHICH GE CAPITAL NOW HAS OR HEREAFTER ACQUIRES; WHETHER OR NOT SUCH CLAIM, RIGHT OR REMEDY ARISES IN EQUITY, UNDER CONTRACT, BY STATUTE, UNDER COMMON LAW OR OTHERWISE.

No termination hereof shall be effective until the Guarantors deliver to GE Capital a written notice signed by them electing not to guarantee any new extension of credit that may be granted by GE Capital to the Company after its receipt of such notice, but such notice shall not affect the obligations of the guarantors hereunder as to any and all Indebtedness existing at the time such notice is received or incurred by the Company within thirty (30) days thereafter. Each Guarantor hereby waives (i) notice of acceptance hereof and notice of extensions of credit given by GE Capital to the Company from time to time; (ii) presentment, demand, protest, and notice of non-payment or protest as to any note or other evidence of indebtedness signed, accepted, endorsed or assigned to GE Capital by the Company; (iii) all exemptions and homestead laws; (iv) any other demands and notices required by law; and (v) any right to trial by jury. GE Capital may at any time and from time to time, without notice to or the consent of any Guarantor, and without affecting or impairing the obligation of any Guarantor hereunder; (a) renew, extend or refinance any part or all of the Indebtedness of the Company or of any Indebtedness of its customers, or of any co-Guarantor (whether hereunder or under a separate instrument) or any other party; (b) accept partial payments of the Indebtedness and apply such payments to any part of the Indebtedness; (c) settle, release (by operation of law or otherwise), compound, compromise, collect or liquidate, in any manner, any of the Indebtedness, any Security, or any Indebtedness of any co-Guarantor (whether hereunder or under a separate instrument) or any other party; (d) consent to the transfer of any Security; (e) bid and purchase at any sale of any of the Agreements or Security; and (f) exercise any and all rights and remedies available to GE Capital by law or agreement even if the exercise thereof may affect, modify or eliminate any rights or remedies which a Guarantor may have against the Company. Each Guarantor shall continue to be liable under this Guaranty, the provisions hereof shall remain in full force and effect, and GE Capital shall not be stopped from exercising any rights hereunder, notwithstanding (i) GE Capital waiver of or failure to enforce any of the terms, covenants or conditions contained in any of the Agreements; (ii) any release of, or failure on the part of GE Capital to perfect any security interest in or foreclose, proceed against, or exhaust, any Security; or (iii) GE Capital failure to take new, additional or substitute security or collateral for the Indebtedness.

Each Guarantor agrees that GE Capital may bring any legal proceedings it deems necessary to enforce any or all of such Guarantor's obligations hereunder in any court in the State in which GE Capital's office administering the Indebtedness is located; and service of process may be made upon such Guarantor by mailing a copy of this summons to such Guarantor at its address last known to GE Capital. All rights and remedies of GE Capital are cumulative and not alternative. Each provision of this Guaranty is intended to be severable. Any term or provision hereof declared to be contrary to, prohibited by or invalid under applicable laws or regulations shall be inapplicable and deemed omitted here from, but shall not invalidate the remaining terms and provisions hereof.

Execution and Transmission of Documentation. This Guaranty and any schedules, exhibits, annexes or related instruments (each an "Instrument") will be created and evidenced as follows: (i) GE Capital will deliver to Guarantors an electronic or paper version of each Instrument; (ii) each Guarantor will print and sign (and initial where indicated), using either ink on paper (a "manual" signature) or, if instructed or expressly permitted by GE Capital in writing, by electronic or digital means (an "electronic" signature), the signature page of each such Instrument and deliver the same to GE Capital electronic, facsimile or other means; (iii) GE Capital will sign (electronically, digitally or manually, at its option) each signature page so delivered by Guarantors (if the Instrument requires GE Capital's signature); and (iv) GE Capital will attach each fully signed signature page to an electronic or printed paper copy of the applicable Instrument. Each Guarantor hereby represents and warrants that it has not modified the Instrument sent to it for signature. Upon a Guarantor's one-time request for a copy of any fully signed Instrument promptly after it has been produced by this process, GE Capital will make the same available to such Guarantor by electronic or other means. Each Instrument produced by this process will be conclusively presumed to be identical to the version signed or initialed by Guarantors, and GE Capital may (at its option) retain only a copy of such Instrument and dispose of the version containing Guarantors' manual signatures. Guarantors and GE Capital each intend that each Instrument produced by this process shall be for all purposes (including perfection of security interests and admissibility of evidence) the sole original authenticated Instrument; and to the extent, if any, that any Instrument constitutes chattel paper (as the term is defined in the applicable Uniform Commercial Code), no security interest in such Instrument may be created through the transfer or possession of any counterpart or copy thereof, other than the Instrument produced by this process. Each Guarantor agrees not to raise as a defense to the enforcement of any Instrument that it or any other Guarantor executed such Instrument by electronic or digital means or used facsimile or other electronic means to transmit its signature on such Instrument. Notwithstanding anything to the contrary herein, GE Capital reserves the right to require Guarantors to sign any Instrument manually and to deliver to GE Capital an original of such Instrument containing Guarantors' manual signatures.

GUARANTOR REPRESENTS THAT GUARANTOR IS A(N) MEMBER OF OR IN THE COMPANY.

IN WITNESS WHEREOF, the Guarantors have executed this Guaranty on JUNE 30, 2015.

| | | |
|---|---|---|
| Witness: | Guarantor: BRANDON FREED | (L.S.) |
| Witness: | By: | |
| | Title: INDIVIDUAL | |
| | Address: 8429 DYLAN LANE, JOPLIN, MO 64804- | |

620861 - Fund off fax
1.7T 1/2015
Doc Request : ☐0002

# CONTINUING GUARANTY

For Valuable Consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned, for themselves, their heirs, executors, personal representatives, successors and assigns (individually called "Guarantor" and collectively called "Guarantors") jointly and severally and in solido, hereby unconditionally guarantee to GENERAL ELECTRIC CAPITAL CORPORATION, GE CAPITAL COMMERCIAL INC., GE TF TRUST and GE TF TRUST and their respective affiliates, together with the respective successors, endorsees and assigns of each of the foregoing (collectively called "GE Capital") that **JFC INVESTMENTS, L.L.C.** (the Company), whose address is **615 SOUTH ELLIOTT ST, WEBB CITY, MO 64870** shall promptly and fully perform, pay and discharge all of its present and future liabilities, obligations and indebtedness to GE Capital, whether direct or indirect, joint or several, absolute or contingent, secured or unsecured, matured or un-matured, and whether originally contracted with or otherwise acquired by GE Capital (all of which liabilities, obligations and indebtedness are herein individually and collectively called the "Indebtedness"). This Guaranty is an absolute and unconditional guarantee of payment and not of collectability. The liability of each Guarantor hereunder is not conditional or contingent upon the genuineness, validity, sufficiency or enforceability of the Indebtedness or any instruments, agreements or chattel paper related thereto (collectively called "Agreements") or any security or collateral there for (collectively called "Security") or the pursuit by GE Capital of any rights or remedies which it now has or may hereafter have. If the Company fails to pay the indebtedness promptly as the same becomes due, or otherwise fails to perform any obligation under any of the Agreements, each Guarantor agrees to pay on demand the entire indebtedness and all losses, costs, attorneys' fees and expenses which may be suffered by GE Capital by reason of the Company's default or the default of any Guarantor hereunder, and agrees to be bound by and to pay on demand any deficiency established by the sale of any of the Agreements or Security, all without relief from valuation and appraisement laws and without requiring GE Capital to (i) proceed against the Company by suit or otherwise, (ii) foreclose, proceed against, liquidate or exhaust any of the Agreements or Security, or (iii) exercise, pursue or enforce any right or remedy GE Capital may have against the Company, any co-Guarantor (whether hereunder or under a separate instrument) or any other party. Each Guarantor agrees that: this Guaranty shall not be discharged or affected by any circumstances which constitute a legal or equitable discharge of a Guarantor or surety, or by the death of any Guarantor; the records of GE Capital shall be received as conclusive evidence of the amount of the Indebtedness at any time owing; one or more successive or concurrent suits may be brought and maintained against any or all of the Guarantors, at the option of GE Capital, with or without joinder of the Company or any of the other Guarantors as parties thereto; such Guarantor will not avail itself of any defense whatsoever which the Company may have against GE Capital, other than full payment of the Indebtedness; and such Guarantor will not seek a change of venue from any jurisdiction or court in which any action, proceeding or litigation is commenced.

Each Guarantor agrees to provide promptly to GE Capital such financial statements and other financial records and information respecting Guarantor as GE Capital may from time to time request. Each Guarantor authorizes GE Capital, throughout the term of this Guaranty, to investigate or make inquiries of creditors or any other persons and credit bureaus regarding Guarantor (including equity holders of Guarantor), and provide to creditors or any other persons any financial, credit or other information regarding or relating to Guarantor, whether supplied by Guarantor to GE Capital or otherwise obtained by GE Capital.

EACH GUARANTOR HEREBY WAIVES NOTICE OF ANY ADVERSE CHANGE IN THE COMPANY'S CONDITION OR OF ANY OTHER FACT WHICH MIGHT MATERIALLY INCREASE SUCH GUARANTOR'S RISK, WHETHER OR NOT GE CAPITAL HAS KNOWLEDGE OF THE SAME. EACH GUARANTOR ALSO HEREBY WAIVES ANY CLAIM, RIGHT OR REMEDY WHICH SUCH GUARANTOR MAY NOW HAVE OR HEREAFTER ACQUIRE AGAINST THE COMPANY THAT ARISES HEREUNDER AND/OR FROM THE PERFORMANCE BY ANY GUARANTOR HEREUNDER INCLUDING, WITHOUT LIMITATION, ANY CLAIM, REMEDY OR RIGHT OF SUBROGATION, REIMBURSEMENT, EXONERATION, CONTRIBUTION, INDEMNIFICATION, OR PARTICIPATION IN ANY CLAIM, RIGHT OR REMEDY OF GE CAPITAL AGAINST THE COMPANY OR ANY SECURITY WHICH GE CAPITAL NOW HAS OR HEREAFTER ACQUIRES; WHETHER OR NOT SUCH CLAIM, RIGHT OR REMEDY ARISES IN EQUITY, UNDER CONTRACT, BY STATUTE, UNDER COMMON LAW OR OTHERWISE.

No termination hereof shall be effective until the Guarantors deliver to GE Capital a written notice signed by them electing not to guarantee any new extension of credit that may be granted by GE Capital to the Company after its receipt of such notice, but such notice shall not affect the obligations of the guarantors hereunder as to any and all Indebtedness existing at the time such notice is received or incurred by the Company within thirty (30) days thereafter. Each Guarantor hereby waives (i) notice of acceptances hereof and notice of extensions of credit given by GE Capital to the Company from time to time; (ii) presentment, demand, protest, and notice of non-payment or protest as to any note or other evidence of indebtedness signed, accepted, endorsed or assigned to GE Capital by the Company; (iii) all exemptions and homestead laws; (iv) any other demands and notices required by law; and (v) any right to trial by jury. GE Capital may at any time and from time to time, without notice to or the consent of any Guarantor, and without affecting or impairing the obligation of any Guarantor hereunder; (a) renew, extend or refinance any part or all of the Indebtedness of the Company or any Indebtedness of its customers, or of any co-Guarantor (whether hereunder or under a separate instrument) or any other party; (b) accept partial payments of the Indebtedness and apply such payments to any part of the Indebtedness; (c) settle, release (by operation of law or otherwise), compound, compromise, collect or liquidate, in any manner, any of the Indebtedness, any Security, or any Indebtedness of any co-Guarantor (whether hereunder or under a separate instrument) or any other party; (d) consent to the transfer of any Security; (e) bid and purchase at any sale of any of the Agreements or Security; and (f) exercise any and all rights and remedies available to GE Capital by law or agreement even if the exercise thereof may affect, modify or eliminate any rights or remedies which a Guarantor may have against the Company. Each Guarantor shall continue to be liable under this Guaranty, the provisions hereof shall remain in full force and effect, and GE Capital shall not be stopped from exercising any rights hereunder, notwithstanding (i) GE Capital waiver of or failure to enforce any of the terms, covenants or conditions contained in any of the Agreements; (ii) any release of, or failure on the part of GE Capital to perfect any security interest in or foreclose, proceed against, or exhaust, any Security; or (iii) GE Capital failure to take new, additional or substitute security or collateral for the Indebtedness.

Each Guarantor agrees that GE Capital may bring any legal proceedings it deems necessary to enforce any or all of such Guarantor's obligations hereunder in any court in the State in which GE Capital's office administering the Indebtedness is located; and service of process may be made upon such Guarantor by mailing a copy of the summons to such Guarantor at its address last known to GE Capital. All rights and remedies of GE Capital are cumulative and not alternative. Each provision of this Guaranty is intended to be severable. Any term or provision hereof declared to be contrary to, prohibited by or invalid under applicable laws or regulations shall be inapplicable and deemed omitted here from, but shall not invalidate the remaining terms and provisions hereof.

Execution and Transmission of Documentation. This Guaranty and any schedules, exhibits, annexes or related instruments (each an "Instrument") will be created and evidenced as follows: (i) GE Capital will deliver to Guarantors an electronic or paper version of each Instrument; (ii) each Guarantor will print and sign (and initial where indicated), using either ink on paper (a "manual" signature) or, if instructed or expressly permitted by GE Capital in writing, by electronic or digital means (an "electronic" signature), the signature page of each such Instrument and deliver the same to GE Capital by electronic, facsimile or other means; (iii) GE Capital will sign (electronically, digitally or manually, at its option) each signature page so delivered by Guarantors (if the Instrument requires GE Capital's signature); and (iv) GE Capital will attach each fully signed signature page to an electronic or printed paper copy of the applicable Instrument. Each Guarantor hereby represents and warrants that it has not modified the Instrument sent to it for signature. Upon a Guarantor's one-time request for a copy of any fully signed Instrument promptly after it has been produced by this process, GE Capital will make the same available to such Guarantor by electronic or other means. Each Instrument produced by this process will be conclusively presumed to be identical to the version signed or initialed by Guarantors, and GE Capital may (at its option) retain only a copy of such Instrument and dispose of the version containing Guarantors' manual signatures. Guarantors and GE Capital each intend that each Instrument produced by this process shall be for all purposes (including perfection of security interests and admissibility of evidence) the sole original authenticated Instrument; and to the extent, if any, that any Instrument constitutes chattel paper (as the term is defined in the applicable Uniform Commercial Code), no security interest in such Instrument may be created through the transfer or possession of any counterpart or copy thereof, other than the Instrument produced by this process. Each Guarantor agrees not to raise as a defense to the enforcement of any Instrument that it or any other Guarantor executed such Instrument by electronic or digital means or used facsimile or other electronic means to transmit its signature on such Instrument. Notwithstanding anything to the contrary herein, GE Capital reserves the right to require Guarantors to sign any Instrument manually and to deliver to GE Capital an original of such Instrument containing Guarantors' manual signatures.

GUARANTOR REPRESENTS THAT GUARANTOR IS A(N) **MEMBER** OF OR IN THE COMPANY.

IN WITNESS WHEREOF, the Guarantors have executed this Guaranty on **JUNE 26, 2015**.

| | | | |
|---|---|---|---|
| Witness: | _[signature]_ Jennifer Hutchins | Guarantor: | **BRANDON FREED** (L.S.) |
| Witness: | _[signature]_ | By: _[signature]_ | Title: **INDIVIDUAL** |
| | | Address: | **8429 DYLAN LANE, JOPLIN, MO 64804-** |

620861 - Fund off fax
1.77 1/2015
Doc Request ████ 0001

# EXHIBIT F

# CONTINUING GUARANTY

For Valuable Consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned, for themselves, their heirs, executors, personal representatives, successors and assigns (individually called "Guarantor" and collectively called "Guarantors") jointly and severally and in solido, hereby unconditionally guarantee to GENERAL ELECTRIC CAPITAL CORPORATION, GE CAPITAL COMMERCIAL INC., GE TF TRUST and GE CF TRUST and their respective affiliates, together with the respective successors, endorsees and assigns of each of the foregoing (collectively called "GE Capital") that 3FC INVESTMENTS, L.L.C. (the Company), whose address is 515 SOUTH ELLIOTT ST, WEBB CITY, MO 64870 shall promptly and fully perform, pay and discharge all of its present and future liabilities, obligations and indebtedness to GE Capital, whether direct or indirect, joint or several, absolute or contingent, secured or unsecured, matured or un-matured, and whether originally contracted with or otherwise acquired by GE Capital (all of which liabilities, obligations and indebtedness are herein individually and collectively called the "Indebtedness"). This Guaranty is an absolute and unconditional guarantee of payment and not of collectability. The liability of each Guarantor hereunder is not conditional or contingent upon the genuineness, validity, sufficiency or enforceability of the Indebtedness or any instruments, agreements or chattel paper related thereto (collectively called "Agreements") or any security or collateral there for (collectively called "Security") or the pursuit by GE Capital of any rights or remedies which it now has or may hereafter have. If the Company fails to pay the Indebtedness promptly as the same becomes due, or otherwise fails to perform any obligation under any of the Agreements, each Guarantor agrees to pay on demand the entire Indebtedness and all losses, costs, attorneys' fees and expenses which may be suffered by GE Capital by reason of the Company's default or the default of any Guarantor hereunder, and agrees to be bound by and to pay on demand any deficiency established by the sale of any of the Agreements or Security, all without relief from valuation and appraisement laws and without requiring GE Capital to (i) proceed against the Company by suit or otherwise, (ii) foreclose, proceed against, liquidate or exhaust any of the Agreements or Security, or (iii) exercise, pursue or enforce any right or remedy GE Capital may have against the Company, any co-Guarantor (whether hereunder or under a separate instrument) or any other party. Each Guarantor agrees that this Guaranty shall not be discharged or affected by any circumstances which constitute a legal or equitable discharge of a Guarantor or surety, or by the death of any Guarantor; the records of GE Capital shall be received as conclusive evidence of the amount of the Indebtedness at any time owing; one or more successive or concurrent suits may be brought and maintained against any or all of the Guarantors, at the option of GE Capital, with or without joinder of the Company or any of the other Guarantors as parties thereto; such Guarantor will not avail itself of any defense whatsoever which the Company may have against GE Capital, other than full payment of the Indebtedness; and such Guarantor will not seek a change of venue from any jurisdiction or court in which any action, proceeding or litigation is commenced.

Each Guarantor agrees to provide promptly to GE Capital such financial statements and other financial records and information respecting Guarantor as GE Capital may from time to time request. Each Guarantor authorizes GE Capital, throughout the term of this Guaranty, to investigate or make inquiries of creditors or any other persons and credit bureaus regarding Guarantor (including equity holders of Guarantor), and provide to creditors or any other persons any financial, credit or other information regarding or relating to Guarantor, whether supplied by Guarantor to GE Capital or otherwise obtained by GE Capital.

EACH GUARANTOR HEREBY WAIVES NOTICE OF ANY ADVERSE CHANGE IN THE COMPANY'S CONDITION OR OF ANY OTHER FACT WHICH MIGHT MATERIALLY INCREASE SUCH GUARANTOR'S RISK, WHETHER OR NOT GE CAPITAL HAS KNOWLEDGE OF THE SAME. EACH GUARANTOR ALSO HEREBY WAIVES ANY CLAIM, RIGHT OR REMEDY WHICH SUCH GUARANTOR MAY NOW HAVE OR HEREAFTER ACQUIRE AGAINST THE COMPANY THAT ARISES HEREUNDER AND/OR FROM THE PERFORMANCE BY ANY GUARANTOR HEREUNDER INCLUDING, WITHOUT LIMITATION, ANY CLAIM, REMEDY OR RIGHT OF SUBROGATION, REIMBURSEMENT, EXONERATION, CONTRIBUTION, INDEMNIFICATION, OR PARTICIPATION IN ANY CLAIM, RIGHT OR REMEDY OF GE CAPITAL AGAINST THE COMPANY OR ANY SECURITY WHICH GE CAPITAL NOW HAS OR HEREAFTER ACQUIRES; WHETHER OR NOT SUCH CLAIM, RIGHT OR REMEDY ARISES IN EQUITY, UNDER CONTRACT, BY STATUTE, UNDER COMMON LAW OR OTHERWISE.

No termination hereof shall be effective until the Guarantors deliver to GE Capital a written notice signed by them electing not to guarantee any new extension of credit that may be granted by GE Capital to the Company after its receipt of such notice, but such notice shall not affect the obligations of the guarantors hereunder as to any and all Indebtedness existing at the time such notice is received or incurred by the Company within thirty (30) days thereafter. Each Guarantor hereby waives (i) notice of acceptance hereof and notice of extensions of credit given by GE Capital to the Company from time to time; (ii) presentment, demand, protest, and notice of non-payment or protest as to any note or other evidence of indebtedness signed, accepted, endorsed or assigned to GE Capital by the Company; (iii) all exemptions and homestead laws; (iv) any other demands and notices required by law; and (v) any right to trial by jury. GE Capital may at any time and from time to time, without notice to or the consent of any Guarantor, and without affecting or impairing the obligation of any Guarantor hereunder: (a) renew, extend or alter any of the Indebtedness of the Company or any indebtedness of its customers, or of any co-Guarantor (whether hereunder or under a separate instrument) or any other party; (b) accept partial payments of the Indebtedness and apply such payments to any part of the Indebtedness; (c) settle, release (by operation of law or otherwise), compound, compromise, collect or liquidate, in any manner, any of the Indebtedness, any Security, or any indebtedness of any co-Guarantor (whether hereunder or under a separate instrument) or any other party; (d) consent to the transfer of any Security; (e) bid and purchase at any sale of any of the Agreements or Security; and (f) exercise any and all rights and remedies available to GE Capital by law or agreement even if the exercise thereof may affect, modify or eliminate any rights or remedies which a Guarantor may have against the Company. Each Guarantor shall continue to be liable under this Guaranty, the provisions hereof shall remain in full force and effect, and GE Capital shall not be stopped from exercising any rights hereunder, notwithstanding (i) GE Capital waiver of or failure to enforce any of the terms, covenants or conditions contained in any of the Agreements; (ii) any release of, or failure on the part of GE Capital to perfect any security interest in or foreclose, proceed against, or exhaust, any Security; or (iii) GE Capital failure to take new, additional or substitute security or collateral for the Indebtedness.

Each Guarantor agrees that GE Capital may bring any legal proceedings it deems necessary to enforce any or all of such Guarantor's obligations hereunder in any court in the State in which GE Capital administering the Indebtedness is located; and service of process may be made upon such Guarantor by mailing a copy of the summons to such Guarantor at its address last known to GE Capital. All rights and remedies of GE Capital are cumulative and not alternative. Each provision of this Guaranty is intended to be severable. Any term or provision hereof declared to be contrary to, prohibited by or invalid under applicable laws or regulations shall be inapplicable and deemed omitted here from, but shall not invalidate the remaining terms and provisions hereof.

Execution and Transmission of Documentation. This Guaranty and any schedules, exhibits, annexes or related instruments (each an "Instrument") will be created and evidenced as follows: (i) GE Capital will deliver to Guarantors an electronic or paper version of each Instrument; (ii) each Guarantor will print and sign (and initial where indicated), using either ink on paper (a "manual" signature) or, if instructed or expressly permitted by GE Capital in writing, by electronic or digital means (an "electronic" signature), the signature page of each such Instrument and deliver the same to GE Capital by electronic, facsimile or other means; (iii) GE Capital will sign (electronically, digitally or manually, at its option) each signature page so delivered by Guarantors (if the Instrument requires GE Capital's signature); and (iv) GE Capital will attach each fully signed signature page to an electronic or printed paper copy of the applicable Instrument. Each Guarantor hereby represents and warrants that it has not modified the Instrument sent to it for signature. Upon a Guarantor's one-time request for a copy of any fully signed Instrument promptly after it has been produced by this process, GE Capital will make the same available to such Guarantor by electronic or other means. Each Instrument produced by this process will be conclusively presumed to be identical to the version signed or initialed by Guarantors and GE Capital may (at its option) retain only a copy of such Instrument and dispose of the version containing Guarantors' manual signatures. Guarantors and GE Capital each intend that each Instrument produced by this process shall be for all purposes (including perfection of security interests and admissibility of evidence) the sole original authenticated Instrument; and to the extent, if any, that any Instrument constitutes chattel paper (as the term is defined in the applicable Uniform Commercial Code), no security interest in such Instrument may be created through the transfer or possession of any counterpart or copy thereof, other than the Instrument produced by this process. Each Guarantor agrees not to raise as a defense to the enforcement of any Instrument that it or any other Guarantor executed such Instrument by electronic or digital means or used facsimile or other electronic means to transmit its signature on such Instrument. Notwithstanding anything to the contrary herein, GE Capital reserves the right to require Guarantors to sign any Instrument manually and to deliver to GE Capital an original of such Instrument containing Guarantors' manual signatures.

GUARANTOR REPRESENTS THAT GUARANTOR IS A(N) MEMBER OF OR IN THE COMPANY.

IN WITNESS WHEREOF, the Guarantors have executed this Guaranty on JUNE 30, 2015.

Witness: _____

Witness: _____

Guarantor: **RONALD FREED** _____ (L.S.)

By: _____ Title: **INDIVIDUAL**

Address: **5607 DOUGLAS FIR ROAD, JOPLIN, MO 64804**

620861 - Fund off fax
1.77 1/2015
Doc Request [ ] 0002

1 of 1

# CONTINUING GUARANTY

For Valuable Consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned, for themselves, their heirs, executors, personal representatives, successors and assigns (individually called "Guarantor" and collectively called "Guarantors") jointly and severally and in solido, hereby unconditionally guarantee to GENERAL ELECTRIC CAPITAL CORPORATION, GE CAPITAL COMMERCIAL INC., GE TF TRUST and GE CF TRUST and their respective affiliates, together with the respective successors, endorsees and assigns of each of the foregoing (collectively called "GE Capital") that SFC INVESTMENTS, L.L.C. (the Company), whose address is 615 SOUTH ELLIOTT ST, WEBB CITY, MO 64870 shall promptly and fully perform, pay and discharge all of its present and future liabilities, obligations and indebtedness to GE Capital, whether direct or indirect, joint or several, absolute or contingent, secured or unsecured, matured or un-matured, and whether originally contracted with or otherwise acquired by GE Capital (all of which liabilities, obligations and indebtedness are hereinafter individually and collectively called the "Indebtedness"). This Guaranty is an absolute and unconditional guarantee of payment and not of collectability. The liability of each Guarantor hereunder is not conditional or contingent upon the genuineness, validity, sufficiency or enforceability of the Indebtedness or any instruments, agreements or chattel paper related thereto (collectively called "Agreements") or any security or collateral there for (collectively called "Security") or the pursuit by GE Capital of any rights or remedies which it now has or may hereafter have. If the Company fails to pay the Indebtedness promptly as the same becomes due, or otherwise fails to perform any obligation under any of the Agreements, each Guarantor agrees to pay on demand the entire Indebtedness and all losses, costs, attorneys' fees and expenses which may be suffered by GE Capital by reason of the Company's default or the default of any Guarantor hereunder, and agrees to be bound by and to pay on demand any deficiency established by the sale of any of the Agreements or Security, all without relief from valuation and appraisement laws and without resulting GE Capital to (i) proceed against the Company by suit or otherwise, (ii) foreclose, proceed against, liquidate or exhaust any of the Agreements or Security, or (iii) exercise, pursue or enforce any right or remedy GE Capital may have against the Company, any co-Guarantor (whether hereunder or under a separate instrument) or any other party. Each Guarantor agrees that this Guaranty shall not be discharged or affected by any circumstances which constitute a legal or equitable discharge of a Guarantor or surety, or by the death of any Guarantor; the records of GE Capital shall be received as conclusive evidence of the amount of the Indebtedness at any time owing; one or more successive or concurrent suits may be brought and maintained against any or all of the Guarantors, at the option of GE Capital, with or without joinder of the Company or any of the other Guarantors as parties thereto; such Guarantor will not avail itself of any defense whatsoever which the Company may have against GE Capital, other than full payment of the Indebtedness; and such Guarantor will not seek a change of venue from any jurisdiction or court in which any action, proceeding or litigation is commenced.

Each Guarantor agrees to provide promptly to GE Capital such financial statements and other financial records and information respecting Guarantor as GE Capital may from time to time request. Each Guarantor authorizes GE Capital, throughout the term of this Guaranty, to investigate or make inquiries of creditors or any other persons and credit bureaus regarding Guarantor (including equity holders of Guarantor), and provide to creditors or any other persons any financial, credit or other information regarding or relating to Guarantor, whether supplied by Guarantor to GE Capital or otherwise obtained by GE Capital.

EACH GUARANTOR HEREBY WAIVES NOTICE OF ANY ADVERSE CHANGE IN THE COMPANY'S CONDITION OR OF ANY OTHER FACT WHICH MIGHT MATERIALLY INCREASE SUCH GUARANTOR'S RISK, WHETHER OR NOT GE CAPITAL HAS KNOWLEDGE OF THE SAME. EACH GUARANTOR ALSO HEREBY WAIVES ANY CLAIM, RIGHT OR REMEDY WHICH SUCH GUARANTOR MAY NOW HAVE OR HEREAFTER ACQUIRE AGAINST THE COMPANY THAT ARISES HEREUNDER AND/OR FROM THE PERFORMANCE BY ANY GUARANTOR HEREUNDER INCLUDING, WITHOUT LIMITATION, ANY CLAIM, REMEDY OR RIGHT OF SUBROGATION, REIMBURSEMENT, EXONERATION, CONTRIBUTION, INDEMNIFICATION, OR PARTICIPATION IN ANY CLAIM, RIGHT OR REMEDY OF GE CAPITAL AGAINST THE COMPANY OR ANY SECURITY WHICH GE CAPITAL NOW HAS OR HEREAFTER ACQUIRES; WHETHER OR NOT SUCH CLAIM, RIGHT OR REMEDY ARISES IN EQUITY, UNDER CONTRACT, BY STATUTE, UNDER COMMON LAW OR OTHERWISE.

No instrument shall be effective until the Guarantors deliver to GE Capital a written notice signed by them electing not to guarantee any new extension of credit that may be granted by GE Capital to the Company after its receipt of such notice, but such notice shall not affect the obligations of the guarantors hereunder as to any and all indebtedness existing at the time such notice is received or incurred by the Company within thirty (30) days thereafter. Each Guarantor hereby waives (i) notice of acceptance hereof and notice of extensions of credit given by GE Capital to the Company from time to time; (ii) presentment, demand, protest, and notice of non-payment or protest as to any note or other evidence of indebtedness signed, accepted, endorsed or assigned to GE Capital by the Company, (iii) all exemptions and homestead laws; (iv) any other demands and notices required by law; and (v) any right to trial by jury. GE Capital may at any time and from time to time, without notice to or the consent of any Guarantor, and without affecting or impairing the obligation of any Guarantor hereunder; (a) renew, extend or refinance any part or all of the Indebtedness of the Company or any indebtedness of its customers, or of any co-Guarantor (whether hereunder or under a separate instrument) or any other party; (b) accept partial payments of the Indebtedness and apply such payments to any part of the Indebtedness; (c) settle, release (by operation of law or otherwise), compound, compromise, collect or liquidate, in any manner, any of the Indebtedness, any Security, or any Indebtedness of any co-Guarantor (whether hereunder or under a separate instrument) or any other party; (d) consent to the transfer of any Security; (e) bid and purchase at any sale of any of the Agreements or Security; and (f) exercise any and all rights and remedies available to GE Capital by law or agreement even if the exercise thereof may affect, modify or eliminate any rights or remedies which a Guarantor may have against GE Capital. Each Guarantor shall continue to be liable under this Guaranty, the provisions hereof shall remain in full force and effect, and GE Capital shall not be stopped from exercising any rights hereunder, notwithstanding (i) GE Capital waiver of or failure to enforce any of the terms, covenants or conditions contained in any of the Agreements; (ii) any release of, or failure on the part of GE Capital to perfect any security interest in or foreclose, proceed against, or exhaust, any Security; or (iii) GE Capital failure to take new, additional or substitute security or collateral for the Indebtedness.

Each Guarantor agrees that GE Capital may bring any legal proceedings it deems necessary to enforce any or all of such Guarantor's obligations hereunder in any court in the State in which GE Capital's office administering the Indebtedness is located; and service of process may be made upon Guarantor by mailing a copy of the summons to such Guarantor at its address last known to GE Capital. All rights and remedies of GE Capital are cumulative and not alternative. Each provision of this Guaranty is intended to be severable. Any term or provision hereof declared to be contrary to, prohibited by or invalid under applicable laws or regulations shall be inapplicable and deemed omitted here from, but shall not invalidate the remaining terms and provisions hereof.

Execution and Transmission of Documentation. This Guaranty and any schedules, exhibits, annexes or related instruments (each an "Instrument") will be created and evidenced as follows: (i) GE Capital will deliver to Guarantors an electronic or paper version of each Instrument; (ii) each Guarantor will print and sign (and initial where indicated), using either ink on paper (a "manual" signature) or, if instructed or expressly permitted by GE Capital in writing, by electronic or digital means (an "electronic" signature), the signature page of each such Instrument and deliver the same to GE Capital by electronic, facsimile or other means; (iii) GE Capital will sign (electronically, digitally or manually, at its option) each signature page as delivered by Guarantors (if the Instrument requires GE Capital's signature); and (iv) GE Capital will attach each fully signed signature page to an electronic or printed paper copy of the applicable Instrument. Each Guarantor hereby represents and warrants that it has not modified the Instrument sent to it for signature. Upon a Guarantor's one-time request for a copy of any fully signed Instrument promptly after it has been produced by this process, GE Capital will make the same available to such Guarantor by electronic or other means. Each Instrument produced by this process will be conclusively presumed to be identical to the version signed or initialed by Guarantors, and GE Capital may (at its option) retain only a copy of such Instrument and dispose of the version containing Guarantors' manual signatures. Guarantors and GE Capital each intend that each Instrument produced by this process shall be for all purposes (including perfection of security interests and admissibility of evidence) the sole original authenticated Instrument; and to the extent, if any, that any Instrument constitutes chattel paper (as the term is defined in the applicable Uniform Commercial Code), no security interest in such Instrument may be created through the transfer or possession of any counterpart or copy thereof, other than the Instrument produced by this process. Each Guarantor agrees not to raise as a defense to the enforcement of any Instrument that it or any other Guarantor executed such Instrument by electronic or digital means or used facsimile or other electronic means to transmit its signature on such Instrument. Notwithstanding anything to the contrary herein, GE Capital reserves the right to require Guarantors to sign any Instrument manually and to deliver to GE Capital an original of such Instrument containing Guarantors' manual signatures.

GUARANTOR REPRESENTS THAT GUARANTOR IS A(N) MEMBER OF OR IN THE COMPANY.

IN WITNESS WHEREOF, the Guarantors have executed this Guaranty on JUNE 26, 2015.

Witness: _____

Witness: _____

Guarantor: RONALD FREED                                    (L.S.)

By: _____  Title: INDIVIDUAL

Address: 5607 DOUGLAS FIR ROAD, JOPLIN, MO 64804

620961 – Fund off fax
1.7T 1/2015
Doc Request: [____]0001

1 of 1

# EXHIBIT G

# CONTINUING GUARANTY

For Valuable Consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned, for themselves, their heirs, executors, personal representatives, successors and assigns (individually called "Guarantor" and collectively called "Guarantors") jointly and severally and in solido, hereby unconditionally guarantee to GENERAL ELECTRIC CAPITAL CORPORATION, GE CAPITAL COMMERCIAL INC., GE TF TRUST and GE CF TRUST and their respective affiliates, together with the respective successors, endorsees and assigns of each of the foregoing (collectively called "GE Capital") that **3FC INVESTMENTS, L.L.C.** (the Company), whose address is **515 SOUTH ELLIOTT ST, WEBB CITY, MO 64870** shall promptly and fully perform, pay and discharge all of its present and future liabilities, obligations and indebtedness to GE Capital, whether direct or indirect, joint or several, absolute or contingent, secured or unsecured, matured or unmatured, and whether originally contracted with or otherwise acquired by GE Capital (all of which liabilities, obligations and indebtedness are herein individually and collectively called the "Indebtedness"). This Guaranty is an absolute and unconditional guarantee of payment and not of collectability. The liability of each Guarantor hereunder is not conditional or contingent upon the genuineness, validity, sufficiency or enforceability of the Indebtedness or any instruments, agreements or chattel paper related thereto (collectively called "Agreements") or any security or collateral there for (collectively called "Security") or the payment by GE Capital of any rights or remedies which it now has or may hereafter have. If the Company fails to pay the indebtedness promptly as the same becomes due, or otherwise fails to perform any obligation under any of the Agreements, each Guarantor agrees to pay on demand the entire indebtedness and all losses, costs, attorneys' fees and expenses which may be suffered by GE Capital by reason of the Company's default or the default of any Guarantor, and agrees to be bound by and to pay on demand any deficiency established by the sale of any of the Agreements or Security, all without relief from valuation and appraisement laws and without requiring GE Capital to (i) proceed against the Company by suit or otherwise, (ii) foreclose, proceed against, liquidate or exhaust any of the Agreements or Security, or (iii) exercise, pursue or enforce any right or remedy GE Capital may have against the Company, any co-Guarantor (whether hereunder or under a separate instrument) or any other party. Each Guarantor agrees that this Guaranty shall not be discharged or affected by any circumstances which constitute a legal or equitable discharge of a Guarantor or surety, or by the death of any Guarantor; the records of GE Capital shall be received as conclusive evidence of the amount of the Indebtedness at any time owing; one or more successive or concurrent suits may be brought and maintained against any or all of the Guarantors, at the option of GE Capital, with or without joinder of the Company or any of the other Guarantors as parties thereto; such Guarantor will not avail itself of any defense whatsoever which the Company may have against GE Capital, other than full payment of the indebtedness; and such Guarantor will not seek a change of venue from any jurisdiction or court in which any action, proceeding or litigation is commenced.

Each Guarantor agrees to provide promptly to GE Capital such financial statements and other financial records and information respecting Guarantor as GE Capital may from time to time request. Each Guarantor authorizes GE Capital, throughout the term of this Guaranty, to investigate or make inquiries of creditors or any other persons and credit bureaus regarding Guarantor (including equity holders of Guarantor), and provide to creditors or any other persons any financial, credit or other information regarding or relating to Guarantor, whether supplied by Guarantor to GE Capital or otherwise obtained by GE Capital.

EACH GUARANTOR HEREBY WAIVES NOTICE OF ANY ADVERSE CHANGE IN THE COMPANY'S CONDITION OR OF ANY OTHER FACT WHICH MIGHT MATERIALLY INCREASE SUCH GUARANTOR'S RISK, WHETHER OR NOT GE CAPITAL HAS KNOWLEDGE OF THE SAME. EACH GUARANTOR ALSO HEREBY WAIVES ANY CLAIM, RIGHT OR REMEDY WHICH SUCH GUARANTOR MAY NOW HAVE OR HEREAFTER ACQUIRE AGAINST THE COMPANY THAT ARISES HEREUNDER AND/OR FROM THE PERFORMANCE BY ANY GUARANTOR HEREUNDER INCLUDING, WITHOUT LIMITATION, ANY CLAIM, REMEDY OR RIGHT OF SUBROGATION, REIMBURSEMENT, EXONERATION, CONTRIBUTION, INDEMNIFICATION, OR PARTICIPATION IN ANY CLAIM, RIGHT OR REMEDY OF GE CAPITAL AGAINST THE COMPANY OR ANY SECURITY WHICH GE CAPITAL NOW HAS OR HEREAFTER ACQUIRES; WHETHER OR NOT SUCH CLAIM, RIGHT OR REMEDY ARISES IN EQUITY, UNDER CONTRACT, BY STATUTE, UNDER COMMON LAW OR OTHERWISE.

No termination hereof shall be effective until the Guarantors deliver to GE Capital a written notice signed by them electing not to guarantee any new extension of credit that may be granted by GE Capital to the Company after its receipt of such notice, but such notice shall not affect the obligations of the guarantors hereunder as to any and all Indebtedness existing at the time such notice is received or incurred by the Company within thirty (30) days thereafter. Each Guarantor hereby waives (i) notice of acceptance hereof and notice of extensions of credit given by GE Capital to the Company from time to time; (ii) presentment, demand, protest, and notice of non-payment or protest as to any note or other evidence of indebtedness signed, accepted, endorsed or assigned to GE Capital by the Company; (iii) all exemptions and homestead laws, (iv) any other demands and notices required by law; and (v) any right to trial by jury. GE Capital may at any time and from time to time, without notice to or the consent of any Guarantor, and without affecting or impairing the obligation of any Guarantor hereunder: (a) renew, extend or refinance any part of the Indebtedness of the Company or any indebtedness of its customers, or of any co-Guarantor (whether hereunder or under a separate instrument) or any other party; (b) accept partial payments of the Indebtedness and apply such payments to any part of the Indebtedness; (c) settle, release (by operation of law or otherwise), compound, compromise, collect or liquidate, in any manner, any of the Indebtedness, any Security, or any Indebtedness of any co-Guarantor (whether hereunder or under a separate instrument) or any other party; (d) consent to the transfer of any Security, (e) bid and purchase at any sale of any of the Agreements or Security; and (f) exercise any and all rights and remedies available to GE Capital by law or agreement even if the exercise thereof may affect, modify or eliminate any rights or remedies which a Guarantor may have against the Company. Each Guarantor shall continue to be liable under this Guaranty, the provisions hereof shall remain in full force and effect, and GE Capital shall not be stopped from exercising any rights hereunder, notwithstanding (i) GE Capital waiver of or failure to enforce any of the terms, covenants or conditions contained in any of the Agreements; (ii) any release of, or failure on the part of GE Capital to perfect any security interest in or foreclose, proceed against, or exhaust, any Security; or (iii) GE Capital failure to take new, additional or substitute security or collateral for the Indebtedness.

Each Guarantor agrees that GE Capital may bring any legal proceedings it deems necessary to enforce any or all of such Guarantor's obligations hereunder in any court in the State in which GE Capital's office administering the Indebtedness is located; and service of process may be made upon such Guarantor by mailing a copy of the summons to such Guarantor at its address last known to GE Capital. All rights and remedies of GE Capital are cumulative and not alternative. Each provision of this Guaranty is intended to be severable. Any term or provision hereof declared to be contrary to, prohibited by or invalid under applicable laws or regulations shall be inapplicable and deemed omitted here from, but shall not invalidate the remaining terms and provisions hereof.

Execution and Transmission of Documentation. This Guaranty and any schedules, exhibits, annexes or related instruments (each an "Instrument") will be created and evidenced as follows: (i) GE Capital will deliver to Guarantors an electronic or paper version of each Instrument; (ii) each Guarantor will print and sign (and initial where indicated), using either ink on paper (a "manual" signature) or, if instructed or expressly permitted by GE Capital in writing, by electronic or digital means (an "electronic" signature), the signature page of each such Instrument and deliver the same to GE Capital by electronic, facsimile or other means; (iii) GE Capital will sign (electronically, digitally or manually, at its option) each signature page so delivered by Guarantors (if the Instrument requires GE Capital's signature); and (iv) GE Capital will attach each fully signed signature page to an electronic or printed paper copy of the applicable Instrument. Each Guarantor hereby represents and warrants that it has not modified the Instrument sent to it for signature. Upon a Guarantor's one-time request for a copy of any fully signed Instrument promptly after it has been produced by this process, GE Capital will make the same available to such Guarantor by electronic or other means. Each Instrument produced by this process will be conclusively presumed to be identical to the version signed or initialed by Guarantors, and GE Capital may (at its option) retain only a copy of such Instrument and dispose of the version containing Guarantors' manual signatures. Guarantors and GE Capital each intend that such Instrument produced by this process shall be for all purposes (including perfection of security interests and admissibility of evidence) the sole original authenticated Instrument; and to the extent, if any, that any Instrument constitutes chattel paper (as the term is defined in the applicable Uniform Commercial Code), no security interest in such Instrument may be created through the transfer or possession of any counterpart or copy thereof, other than the Instrument produced by this process. Each Guarantor agrees not to raise as a defense to the enforcement of any Instrument that it or any other Guarantor executed such Instrument by electronic or digital means or used facsimile or other electronic means to transmit its signature on such Instrument. Notwithstanding anything to the contrary herein, GE Capital reserves the right to require Guarantors to sign any Instrument manually and to deliver to GE Capital an original of such Instrument containing Guarantors' manual signatures.

GUARANTOR REPRESENTS THAT GUARANTOR IS A(N) **MEMBER** OF OR IN THE COMPANY.

IN WITNESS WHEREOF, the Guarantors have executed this Guaranty on **JUNE 30, 2015.**

Witness: _____

Witness: _____

Guarantor: **SCOTT COOPER**        (L.S.)

By: _____    Title: **INDIVIDUAL**

Address: **PO BX 3751, JOPLIN, MO 64803**

629861 - Fund off fax
1.TT 1/2015
Doc Request #: _____0002

1 of 1

# CONTINUING GUARANTY

For Valuable Consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned, for themselves, their heirs, executors, personal representatives, successors and assigns (individually called "Guarantor" and collectively called "Guarantors") jointly and severally and in solido, hereby unconditionally guarantee to GENERAL ELECTRIC CAPITAL CORPORATION, GE CAPITAL COMMERCIAL INC., GE TF TRUST and GE CF TRUST and their respective affiliates, together with the respective successors, endorsees and assigns of each of the foregoing (collectively called "GE Capital") that JFC INVESTMENTS, L.L.C. (the Company), whose address is 615 SOUTH ELLIOTT ST, WEBB CITY, MO 84870 shall promptly and fully perform, pay and discharge all of its present and future liabilities, obligations and indebtedness to GE Capital, whether direct or indirect, joint or several, absolute or contingent, secured or unsecured, matured or un-matured, and whether originally contracted with or otherwise acquired by GE Capital (all of which liabilities, obligations and indebtedness are herein individually and collectively called the "Indebtedness"). This Guaranty is an absolute and unconditional guarantee of payment and not of collectability. The liability of each Guarantor hereunder is not conditional or contingent upon the genuineness, validity, sufficiency or enforceability of the Indebtedness or any instruments, agreements or chattel paper related thereto (collectively called "Agreements") or any security or collateral there for (collectively called "Security") or the pursuit by GE Capital of any rights or remedies which it now has or may hereafter have. If the Company fails to pay the Indebtedness promptly as the same becomes due, or otherwise fails to perform any obligation under any of the Agreements, each Guarantor agrees to pay on demand the entire Indebtedness and all losses, costs, attorneys' fees and expenses which may be suffered by GE Capital by reason of the Company's default or the default of any Guarantor hereunder, and agrees to be bound by and to pay on demand any deficiency established by the sale of any of the Agreements or Security, all without relief from valuation and appraisement laws and without requiring GE Capital to (i) proceed against the Company by suit or otherwise, (ii) foreclose, proceed against, liquidate or exhaust any of the Agreements or Security, or (iii) exercise, pursue or enforce any right or remedy GE Capital may have against the Company, any co-Guarantor (whether hereunder or under a separate instrument) or any other party. Each Guarantor agrees that this Guaranty shall not be discharged or affected by any circumstances which constitute a legal or equitable discharge of a Guarantor or surety, or by the death of any Guarantor; the records of GE Capital shall be received as conclusive evidence of the amount of the Indebtedness at any time owing; one or more successive or concurrent suits may be brought and maintained against any or all of the Guarantors, at the option of GE Capital, with or without joinder of the Company or any of the other Guarantors as parties thereto; such Guarantor will not avail itself of any defense whatsoever which the Company may have against GE Capital, other than full payment of the Indebtedness; and such Guarantor will not seek a change of venue from any jurisdiction or court in which any action, proceeding or litigation is commenced.

Each Guarantor agrees to provide promptly to GE Capital such financial statements and other financial records and information respecting Guarantor as GE Capital may from time to time request. Each Guarantor authorizes GE Capital, throughout the term of this Guaranty, to investigate or make inquiries of creditors or any other persons and credit bureaus regarding Guarantor (including equity holders of Guarantor), and provide to creditors or any other persons any financial, credit or other information regarding or relating to Guarantor, whether supplied by Guarantor to GE Capital or otherwise obtained by GE Capital.

EACH GUARANTOR HEREBY WAIVES NOTICE OF ANY ADVERSE CHANGE IN THE COMPANY'S CONDITION OR OF ANY OTHER FACT WHICH MIGHT MATERIALLY INCREASE SUCH GUARANTOR'S RISK, WHETHER OR NOT GE CAPITAL HAS KNOWLEDGE OF THE SAME. EACH GUARANTOR ALSO HEREBY WAIVES ANY CLAIM, RIGHT OR REMEDY WHICH SUCH GUARANTOR MAY NOW HAVE OR HEREAFTER ACQUIRE AGAINST THE COMPANY THAT ARISES HEREUNDER AND/OR FROM THE PERFORMANCE BY ANY GUARANTOR HEREUNDER INCLUDING, WITHOUT LIMITATION, ANY CLAIM, REMEDY OR RIGHT OF SUBROGATION, REIMBURSEMENT, EXONERATION, CONTRIBUTION, INDEMNIFICATION, OR PARTICIPATION IN ANY CLAIM, RIGHT OR REMEDY OF GE CAPITAL AGAINST THE COMPANY OR ANY SECURITY WHICH GE CAPITAL NOW HAS OR HEREAFTER ACQUIRES; WHETHER OR NOT SUCH CLAIM, RIGHT OR REMEDY ARISES IN EQUITY, UNDER CONTRACT, BY STATUTE, UNDER COMMON LAW OR OTHERWISE.

No termination hereof shall be effective until the Guarantors deliver to GE Capital a written notice signed by them electing not to guarantee any new extension of credit that may be granted by GE Capital to the Company after its receipt of such notice, but such notice shall not affect the obligations of the guarantors hereunder as to any and all Indebtedness existing at the time such notice is received or incurred by the Company within thirty (30) days thereafter. Each Guarantor hereby waives (i) notice of acceptance hereof and notice of extensions of credit given by GE Capital to the Company from time to time; (ii) presentment, demand, protest, and notice of non-payment or protest as to any note or other evidence of indebtedness signed, accepted, endorsed or assigned to GE Capital by the Company; (iii) all exemptions and homestead laws; (iv) any other demands and notices required by law; and (v) any right to trial by jury. GE Capital may at any time and from time to time, without notice to or the consent of any Guarantor, and without affecting or impairing the obligation of any Guarantor hereunder; (a) renew, extend or refinance any part or all of the Indebtedness of the Company or any indebtedness of its customers, or of any co-Guarantor (whether hereunder or under a separate instrument) or any other party; (b) accept partial payments of the Indebtedness and apply such payments to any part of the Indebtedness or any co-Guarantor (whether hereunder or under a separate instrument) or any other party; (c) consent to the transfer of any Security; (d) bid and purchase at any sale of any of the Agreements or Security; and (f) exercise any and all rights and remedies available to GE Capital by law or agreement even if the exercise thereof may affect, modify or eliminate any rights or remedies which a Guarantor may have against the Company. Each Guarantor shall continue to be liable under this Guaranty, the provisions hereof shall remain in full force and effect, and GE Capital shall not be stopped from exercising any rights hereunder, notwithstanding (i) GE Capital waiver of or failure to enforce any of the terms, covenants or conditions contained in any of the Agreements; (ii) any release of, or failure on the part of GE Capital to perfect any security interest in or foreclose, proceed against, or exhaust, any Security; or (iii) GE Capital failure to take new, additional or substitute security or collateral for the Indebtedness.

Each Guarantor agrees that GE Capital may bring any legal proceedings it deems necessary to enforce any or all of such Guarantor's obligations hereunder in any court in the State in which GE Capital's office administering the Indebtedness is located; and service of process may be made upon such Guarantor by mailing a copy of the summons to such Guarantor at its address last known to GE Capital. All rights and remedies of GE Capital are cumulative and not alternative. Each provision of this Guaranty is intended to be severable. Any term or provision hereof declared to be contrary to, prohibited by or invalid under applicable laws or regulations shall be inapplicable and deemed omitted here from, but shall not invalidate the remaining terms and provisions hereof.

Execution and Transmission of Documentation. This Guaranty and any schedules, exhibits, annexes or related instruments (each an "Instrument") will be created and evidenced as follows: (i) GE Capital will deliver to Guarantors an electronic or paper version of each Instrument; (ii) each Guarantor will print and sign (and initial where indicated), using either ink on paper (a "manual" signature) or, if instructed or expressly permitted by GE Capital in writing, by electronic or digital means (an "electronic" signature), the signature page of each such Instrument and deliver the same to GE Capital by electronic, facsimile or other means; (iii) GE Capital will sign (electronically, digitally or manually, at its option) each signature page so delivered by Guarantors (if the Instrument requires GE Capital's signature); and (iv) GE Capital will attach each fully signed signature page to an electronic or printed paper copy of the applicable Instrument. Each Guarantor hereby represents and warrants that it has not modified the Instrument sent to it for signature. Upon a Guarantor's one-time request for a copy of any fully signed Instrument promptly after it has been produced by this process, GE Capital will make the same available to such Guarantor by electronic or other means. Each Instrument produced by this process will be conclusively presumed to be identical to the version signed or initialed by Guarantors, and GE Capital may (at its option) retain only a copy of such Instrument and dispose of the version containing Guarantors' manual signatures. Guarantors and GE Capital each intend that each Instrument produced by this process shall be for all purposes (including perfection of security interests and admissibility of evidence) the sole original authenticated Instrument; and to the extent, if any, that any Instrument constitutes chattel paper (as the term is defined in the applicable Uniform Commercial Code), no security interest in such Instrument may be created through the transfer or possession of any counterpart or copy thereof, other than the Instrument produced by this process. Each Guarantor agrees not to raise as a defense to the enforcement of any Instrument that it or any other Guarantor executed such Instrument by electronic or digital means or used facsimile or other electronic means to transmit its signature on such Instrument. Notwithstanding anything to the contrary herein, GE Capital reserves the right to require Guarantors to sign any Instrument manually and to deliver to GE Capital an original of such Instrument containing Guarantor's manual signatures.

GUARANTOR REPRESENTS THAT GUARANTOR IS A(N) MEMBER OF OR IN THE COMPANY.

IN WITNESS WHEREOF, the Guarantors have executed this Guaranty on JUNE 25, 2015.

Witness: _____  Guarantor: SCOTT COOPER _____ (L.S.)

Witness: _____  By: _____  Title: INDIVIDUAL

Address: PO BX 3751, JOPLIN, MO 64803

620851 - Fund off fax
1.TT 1/2015
Doc Request: ██████0001

1 of 1

# EXHIBIT H

# CONTINUING GUARANTY

For Valuable Consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned, for themselves, their heirs, executors, personal representatives, successors and assigns (individually called "Guarantor" and collectively called "Guarantors") jointly and severally and in solido, hereby unconditionally guarantee to GENERAL ELECTRIC CAPITAL CORPORATION, GE CAPITAL COMMERCIAL INC., GE TF TRUST and GE CF TRUST and their respective affiliates, together with the respective successors, endorsees and assigns of each of the foregoing (individually called "GE Capital") that **JFC INVESTMENTS, L.L.C.** (the Company), whose address is **615 SOUTH ELLIOTT ST, WEBB CITY, MO 64870** shall promptly and fully perform, pay and discharge all of its present and future liabilities, obligations and indebtedness to GE Capital, whether direct or indirect, joint or several, absolute or contingent, secured or unsecured, matured or un-matured, and whether originally contracted with or otherwise acquired by GE Capital (all of which liabilities, obligations and indebtedness are herein individually and collectively called the "Indebtedness"). This Guaranty is an absolute and unconditional guarantee of payment and not of collectability. Each Guarantor hereunder is not conditional or contingent upon the genuineness, validity, sufficiency or enforceability of the Indebtedness or any instruments, agreements or chattel paper related thereto (collectively called "Agreements") or any security or collateral there for (collectively called "Security") or the pursuit by GE Capital of any rights or remedies which it now has or may hereafter have. If the Company fails to pay the Indebtedness promptly as the same becomes due, or otherwise fails to perform any obligation under any of the Agreements, each Guarantor agrees to pay on demand the entire Indebtedness and all losses, costs, attorneys' fees and expenses which may be suffered by GE Capital by reason of the Company's default or the default of any Guarantor hereunder, and agrees to be bound by and to pay on demand any deficiency established by the sale of any of the Agreements or Security, all without relief from valuation and appraisement laws and without requiring GE Capital to (i) proceed against the Company by suit or otherwise, (ii) foreclose, proceed against, liquidate or exhaust any of the Agreements or Security, or (iii) exercise, pursue or enforce any right or remedy GE Capital may have against the Company, any co-Guarantor (whether hereunder or under a separate instrument) or any other party. Each Guarantor agrees that: this Guaranty shall not be discharged or affected by any circumstances which constitute a legal or equitable discharge of a Guarantor or surety, or by the death of any Guarantor; the records of GE Capital shall be received as conclusive evidence of the amount of the Indebtedness at any time owing; one or more successive or concurrent suits may be brought and maintained against any or all of the Guarantors, at the option of GE Capital, with or without joinder of the Company or any of the other Guarantors as parties thereto; such Guarantor will not avail itself of any defense whatsoever which the Company may have against GE Capital, other than full payment of the Indebtedness; and such Guarantor will not seek a change of venue from any jurisdiction or court in which any action, proceeding or litigation is commenced.

Each Guarantor agrees to provide promptly to GE Capital such financial statements and other financial records and information respecting Guarantor as GE Capital may from time to time request. Each Guarantor authorizes GE Capital, throughout the term of this Guaranty, to investigate or make inquiries of creditors or any other persons and credit bureaus regarding Guarantor (including equity holders of Guarantor), and provide to creditors or any other persons any financial, credit or other information regarding or relating to Guarantor, whether supplied by Guarantor to GE Capital or otherwise obtained by GE Capital.

EACH GUARANTOR HEREBY WAIVES NOTICE OF ANY ADVERSE CHANGE IN THE COMPANY'S CONDITION OR OF ANY OTHER FACT WHICH MIGHT MATERIALLY INCREASE SUCH GUARANTOR'S RISK, WHETHER OR NOT GE CAPITAL HAS KNOWLEDGE OF THE SAME. EACH GUARANTOR ALSO HEREBY WAIVES ANY CLAIM, RIGHT OR REMEDY WHICH SUCH GUARANTOR MAY NOW HAVE OR HEREAFTER ACQUIRE AGAINST THE COMPANY THAT ARISES HEREUNDER AND/OR FROM THE PERFORMANCE BY ANY GUARANTOR HEREUNDER INCLUDING, WITHOUT LIMITATION, ANY CLAIM, REMEDY OR RIGHT OF SUBROGATION, REIMBURSEMENT, EXONERATION, CONTRIBUTION, INDEMNIFICATION, OR PARTICIPATION IN ANY CLAIM, RIGHT OR REMEDY OF GE CAPITAL AGAINST THE COMPANY OR ANY SECURITY WHICH GE CAPITAL NOW HAS OR HEREAFTER ACQUIRES; WHETHER OR NOT SUCH CLAIM, RIGHT OR REMEDY ARISES IN EQUITY, UNDER CONTRACT, BY STATUTE, UNDER COMMON LAW OR OTHERWISE.

No termination hereof shall be effective until the Guarantors deliver to GE Capital a written notice signed by them electing not to guarantee any new extension of credit that may be granted by GE Capital to the Company after its receipt of such notice, but such notice shall not affect the obligations of the guarantors hereunder as to any and all Indebtedness existing at the time such notice is received or incurred by the Company within thirty (30) days thereafter. Each Guarantor hereby waives (i) notice of acceptance hereof and notice of extensions of credit given by GE Capital to the Company from time to time; (ii) presentment, demand, protest, and notice of non-payment or protest as to any note or other evidence of Indebtedness signed, accepted, endorsed or assigned to GE Capital by the Company, (iii) all exemptions and homestead laws; (iv) any other demands and notices required by law; and (v) any right to trial by jury. GE Capital may at any time and from time to time, without notice to or the consent of any Guarantor, and without affecting or impairing the obligation of any Guarantor hereunder; (a) renew, extend or refinance any part or all of the Indebtedness of the Company or any Indebtedness of its customers, or of any co-Guarantor (whether hereunder or under a separate instrument) or any other party; (b) accept partial payments of the Indebtedness and apply such payments to any part of the Indebtedness; (c) settle, release (by operation of law or otherwise), compound, compromise, collect or liquidate, in any manner, any of the Indebtedness, any Security, or any Indebtedness of any co-Guarantor (whether hereunder or under a separate instrument) or any other party; (d) consent to the transfer of any Security; (e) bid and purchase at any sale of any of the Agreements or Security; and (f) exercise any and all rights and remedies available to GE Capital by law or agreement even if the exercise thereof may affect, modify or eliminate any rights or remedies which a Guarantor may have against the Company. Each Guarantor shall continue to be liable under this Guaranty, the provisions hereof shall remain in full force and effect, and GE Capital shall not be stopped from exercising any rights hereunder, notwithstanding (i) GE Capital waiver of or failure to enforce any of the terms, covenants or conditions contained in any of the Agreements; (ii) any release of, or failure on the part of GE Capital to perfect any security interest in or foreclose, proceed against, or exhaust, any Security; or (iii) GE Capital failure to take new, additional or substitute security or collateral for the Indebtedness.

Each Guarantor agrees that GE Capital may bring any legal proceedings it deems necessary to enforce any or all of such Guarantor's obligations hereunder in any court in the State in which GE Capital's office administering the Indebtedness is located; and service of process may be made upon such Guarantor by mailing a copy of the summons to such Guarantor at its address last known to GE Capital. All rights and remedies of GE Capital are cumulative and not alternative. Each provision of this Guaranty is intended to be severable. Any term or provision hereof declared to be contrary to, prohibited by or invalid under applicable laws or regulations shall be inapplicable and deemed omitted here from, but shall not invalidate the remaining terms and provisions hereof.

**Execution and Transmission of Documentation.** This Guaranty and any schedules, exhibits, annexes or related instruments (each an "Instrument") will be created and evidenced as follows: (i) GE Capital will deliver to Guarantors an electronic or paper version of each Instrument; (ii) each Guarantor will print and sign (and initial where indicated), using either ink on paper (a "manual" signature) or, if instructed or expressly permitted by GE Capital in writing, by electronic or digital means (an "electronic" signature), the signature page of each such Instrument and deliver the same to GE Capital by electronic, facsimile or other means; (iii) GE Capital will sign (electronically, digitally or manually, at its option) each signature page so delivered by Guarantors (if the Instrument requires GE Capital's signature); and (iv) GE Capital will attach each fully signed signature page to an electronic or printed paper copy of the applicable Instrument. Each Guarantor hereby represents and warrants that it has not modified the Instrument sent to it for signature. Upon a Guarantor's one-time request for a copy of any fully signed Instrument promptly after it has been produced by this process, GE Capital will make the same available to such Guarantor by electronic or other means. Each Instrument produced by this process will be conclusively presumed to be identical to the version signed or initialed by Guarantors, and GE Capital may (at its option) retain only a copy of such Instrument and dispose of the version containing Guarantors' manual signatures. Guarantors and GE Capital each intend that each Instrument produced by this process shall be for all purposes (including perfection of security interests and admissibility of evidence) the sole original authenticated Instrument; and to the extent, if any, that any Instrument constitutes chattel paper (as the term is defined in the applicable Uniform Commercial Code), no security interest in such Instrument may be created through the transfer or possession of any counterpart or copy thereof, other than the Instrument produced by this process. Each Guarantor agrees not to raise as a defense to the enforcement of any Instrument that it or any other Guarantor executed such Instrument by electronic or digital means or used facsimile or other electronic means to transmit its signature on such Instrument. Notwithstanding anything to the contrary herein, GE Capital reserves the right to require Guarantors to sign any Instrument manually and to deliver to GE Capital an original of such Instrument containing Guarantors' manual signatures.

GUARANTOR REPRESENTS THAT GUARANTOR IS A(N) **MEMBER** OF OR IN THE COMPANY.

IN WITNESS WHEREOF, the Guarantors have executed this Guaranty on **JUNE 30, 2015.**

| | |
|---|---|
| Witness: _[signature]_ | Guarantor: **TONY FORSON** (L.S.) |
| Witness: _[signature]_ | By: _[signature]_ Title: **INDIVIDUAL** |
| | Address: **2900 IRONTON LANE, JOPLIN, MO 64804** |

620561 - Fund off fax
1.7T 1/2015
Doc Request ▓▓▓▓▓▓0002

1 of 1

# CONTINUING GUARANTY

For Valuable Consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned, for themselves, their heirs, executors, personal representatives, successors and assigns (individually called "Guarantor" and collectively called "Guarantors") jointly and severally and in solido, hereby unconditionally guarantee to GENERAL ELECTRIC CAPITAL CORPORATION, GE CAPITAL COMMERCIAL INC., GE TF TRUST and GE CF TRUST and their respective affiliates, together with the respective successors, endorsees and assigns of each of the foregoing (collectively "GE Capital") that JFC INVESTMENTS, L.L.C. (the Company), whose address is 515 SOUTH ELLIOTT ST, WEBB CITY, MO 64870 shall promptly and fully perform, pay and discharge all of its present and future liabilities, obligations and indebtedness to GE Capital, whether direct or indirect, joint or several, absolute or contingent, secured or unsecured, matured or un-matured, and whether originally contracted with or otherwise acquired by GE Capital (all of which liabilities, obligations and indebtedness are herein individually and collectively called the "Indebtedness"). This Guaranty is an absolute and unconditional guarantee of payment and not of collectability. The liability of each Guarantor hereunder is not conditional or contingent upon the genuineness, validity, sufficiency or enforceability of the Indebtedness or any instruments, agreements or chattel paper related thereto (collectively called "Agreements") or any security or collateral there for (collectively called "Security") or the pursuit by GE Capital of any rights or remedies which it now has or may hereafter have. If the Company fails to pay the Indebtedness promptly as the same becomes due, or otherwise fails to perform any obligation under any of the Agreements, each Guarantor agrees to pay on demand the entire Indebtedness and all losses, costs, attorneys' fees and expenses which may be suffered by GE Capital by reason of the Company's default or the default of any Guarantor hereunder, and agrees to be bound by and to pay on demand any deficiency established by the sale of any of the Agreements or Security, all without relief from valuation and appraisement laws and without requiring GE Capital to (i) proceed against the Company by suit or otherwise, (ii) foreclose, proceed against, liquidate or exhaust any of the Agreements or Security, or (iii) exercise, pursue or enforce any right or remedy GE Capital may have against the Company, any co-Guarantor (whether hereunder or under a separate instrument) or any other party. Each Guarantor agrees that: this Guaranty shall not be discharged or affected by any circumstances which constitute a legal or equitable discharge of a Guarantor or surety, or by the death of any Guarantor; the records of GE Capital shall be received as conclusive evidence of the amount of the Indebtedness at any time owing; one or more successive or concurrent suits may be brought and maintained against any or all of the Guarantors, at the option of GE Capital, with or without joinder of the Company or any of the other Guarantors as parties thereto; such Guarantor will not avail itself of any defense whatsoever which the Company may have against GE Capital, other than full payment of the Indebtedness, and such Guarantor will not seek a change of venue from any jurisdiction or court in which any action, proceeding or litigation is commenced.

Each Guarantor agrees to provide promptly to GE Capital such financial statements and other financial records and information respecting Guarantor as GE Capital may from time to time request. Each Guarantor authorizes GE Capital, throughout the term of this Guaranty, to investigate or make inquiries of creditors or any other persons and credit bureaus regarding Guarantor (including equity holders of Guarantor), and provide to creditors or any other persons any financial, credit or other information regarding or relating to Guarantor, whether supplied by Guarantor to GE Capital or otherwise obtained by GE Capital.

EACH GUARANTOR HEREBY WAIVES NOTICE OF ANY ADVERSE CHANGE IN THE COMPANY'S CONDITION OR OF ANY OTHER FACT WHICH MIGHT MATERIALLY INCREASE SUCH GUARANTOR'S RISK, WHETHER OR NOT GE CAPITAL HAS KNOWLEDGE OF THE SAME. EACH GUARANTOR ALSO HEREBY WAIVES ANY CLAIM, RIGHT OR REMEDY WHICH SUCH GUARANTOR MAY NOW HAVE OR HEREAFTER ACQUIRE AGAINST THE COMPANY THAT ARISES HEREUNDER AND/OR FROM THE PERFORMANCE BY ANY GUARANTOR HEREUNDER INCLUDING, WITHOUT LIMITATION, ANY CLAIM, REMEDY OR RIGHT OF SUBROGATION, REIMBURSEMENT, EXONERATION, CONTRIBUTION, INDEMNIFICATION, OR PARTICIPATION IN ANY CLAIM, RIGHT OR REMEDY OF GE CAPITAL AGAINST THE COMPANY OR ANY SECURITY WHICH GE CAPITAL NOW HAS OR HEREAFTER ACQUIRES; WHETHER OR NOT SUCH CLAIM, RIGHT OR REMEDY ARISES IN EQUITY, UNDER CONTRACT, BY STATUTE, UNDER COMMON LAW OR OTHERWISE.

No termination hereof shall be effective until the Guarantors deliver to GE Capital a written notice signed by them electing not to guarantee any new extension of credit that may be granted by GE Capital to the Company after its receipt of such notice, but such notice shall not affect the obligations of the guarantors hereunder as to any and all Indebtedness existing at the time such notice is received or incurred by the Company within thirty (30) days thereafter. Each Guarantor hereby waives (i) notice of acceptance hereof and notice of extensions of credit given by GE Capital to the Company from time to time; (ii) presentment, demand, protest, and notice of non-payment or protest as to any note or other evidence of indebtedness signed, accepted, endorsed or assigned to GE Capital by the Company; (iii) all exemptions and homestead laws; (iv) any other demands and notices required by law; and (v) any right to trial by jury. GE Capital may at any time and from time to time, without notice to or the consent of any Guarantor, and without affecting or impairing the obligation of any Guarantor hereunder: (a) renew, extend or refinance any part or all of the Indebtedness of the Company or any Indebtedness of its customers, or of any co-Guarantor (whether hereunder or under a separate instrument) or any other party; (b) accept partial payments of the Indebtedness and apply such payments to any part of the Indebtedness; (c) settle, release (by operation of law or otherwise), compound, compromise, collect or liquidate, in any manner, any of the Indebtedness, any Security, or any Indebtedness of any co-Guarantor (whether hereunder or under a separate instrument) or any other party; (d) consent to the transfer of any Security; (e) bid and purchase at any sale of any of the Agreements or Security; and (f) exercise any and all rights and remedies available to GE Capital by law or agreement even if the exercise thereof may affect, modify or eliminate any rights or remedies which a Guarantor may have against the Company. Each Guarantor agrees that GE Capital shall continue to be liable under this Guaranty, the provisions of any of the terms, covenants or conditions contained in any of the Agreements; (ii) any release of, or failure on the part of GE Capital to perfect any security interest in or foreclose, proceed against, or exhaust, any Security; or (iii) GE Capital failure to take new, additional or substitute security or collateral for the Indebtedness.

Each Guarantor agrees that GE Capital may bring any legal proceedings it deems necessary to enforce any or all of such Guarantor's obligations hereunder in any court in the State in which GE Capital's office administering the Indebtedness is located; and service of process may be made upon such Guarantor by mailing a copy of the summons to such Guarantor at its address last known to GE Capital. All rights and remedies of GE Capital are cumulative and not alternative. Each provision of this Guaranty is intended to be severable. Any term or provision hereof declared to be contrary to, prohibited by or invalid under applicable laws or regulations shall be inapplicable and deemed omitted here from, but shall not invalidate the remaining terms and provisions hereof.

Execution and Transmission of Documentation. This Guaranty and any schedules, exhibits, annexes or related instruments (each an "Instrument") will be created and evidenced as follows: (i) GE Capital will deliver to Guarantors an electronic or paper version of each Instrument; (ii) each Guarantor will print and sign (and initial where indicated), using either ink on paper (a "manual" signature) or, if instructed or expressly permitted by GE Capital in writing, by electronic or digital means (an "electronic" signature), the signature page of each such Instrument and deliver the same to GE Capital by electronic, facsimile or other means; (iii) GE Capital will sign (electronically, digitally or manually, at its option) each signature page as delivered by Guarantors (if the Instrument requires GE Capital's signature); and (iv) GE Capital will attach each fully signed signature page to an electronic or printed paper copy of the applicable Instrument. Each Guarantor hereby represents and warrants that it has not modified the Instrument sent to it for signature. Upon a Guarantor's one-time request for a copy of any fully signed Instrument promptly after it has been produced by this process, GE Capital will make the same available to such Guarantor by electronic or other means. Each Instrument produced by this process will be conclusively presumed to be identical to the version signed or initialed by Guarantors and GE Capital may (at its option) retain only a copy of such Instrument and dispose of the version containing Guarantors' manual signatures. Guarantors and GE Capital each intend that each Instrument produced by this process shall be for all purposes (including perfection of security interests and admissibility of evidence) the sole original authenticated Instrument; and to the extent, if any, that any Instrument constitutes chattel paper (as the term is defined in the applicable Uniform Commercial Code), no security interest in such Instrument may be created through the transfer of possession of any counterpart or copy thereof, other than the Instrument produced by this process. Each Guarantor agrees not to raise as a defense to the enforcement of any Instrument that it or any other Guarantor executed such Instrument by electronic or digital means or used facsimile or other electronic means to transmit its signature on such Instrument. Notwithstanding anything to the contrary herein, GE Capital reserves the right to require Guarantors to sign any Instrument manually and to deliver to GE Capital an original of such Instrument containing Guarantors' manual signatures.

GUARANTOR REPRESENTS THAT GUARANTOR IS A(N) MEMBER OF OR IN THE COMPANY.

IN WITNESS WHEREOF, the Guarantors have executed this Guaranty on JUNE 26, 2015.

Witness: _____

Witness: _____

Guarantor: **TONY FORSON** _____ (L.S.)

By: _____  Title: **INDIVIDUAL**

Address: **2900 IRONTON LANE, JOPLIN, MO 64804**

620861 - Fund off fax
1.7T  1/2015
Doc Request _____0001

1 of 1